IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

January 2016 Term

No. 15-0211

**FILED**

**June 3, 2016**

released at 3:00 p.m.
RORY L. PERRY, II CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

STATE OF WEST VIRGINIA,
Plaintiff Below, Respondent

v.

TIMOTHY C.,
Defendant Below, Petitioner

Appeal from the Circuit Court of Jackson County
Honorable Thomas C. Evans, III, Judge
Criminal Action No. 13-F-84

AFFIRMED, IN PART; REVERSED, IN PART; AND REMANDED

Submitted: April 19, 2016
Filed: June 3, 2016

Crystal L. Walden, Esq.
Public Defender Services
Charleston, West Virginia
Counsel for Petitioner

Patrick Morrisey, Esq.
Attorney General
Nic Dalton, Esq.
Assistant Attorney General
Shannon Kiser, Esq.
Assistant Attorney General
Charleston, West Virginia
Counsel for Respondent

JUSTICE LOUGHRY delivered the Opinion of the Court.

**SYLLABUS BY THE COURT**

1. "A trial court's evidentiary rulings, as well as its application of the Rules of Evidence, are subject to review under an abuse of discretion standard." Syl. Pt. 4, *State v. Rodoussakis*, 204 W.Va. 58, 511 S.E.2d 469 (1998).

2. "The test used to determine whether a trial court's exclusion of proffered evidence under our rape shield law violated a defendant's due process right to a fair trial is (1) whether that testimony was relevant; (2) whether the probative value of the evidence outweighed its prejudicial effect; and (3) whether the State's compelling interests in excluding the evidence outweighed the defendant's right to present relevant evidence supportive of his or her defense. Under this test, we will reverse a trial court's ruling only if there has been a clear abuse of discretion." Syl. Pt. 6, *State v. Guthrie*, 205 W.Va. 326, 518 S.E.2d 83 (1999).

3. "A criminal defendant challenging the sufficiency of the evidence to support a conviction takes on a heavy burden. An appellate court must review all the evidence, whether direct or circumstantial, in the light most favorable to the prosecution and must credit all inferences and credibility assessments that the jury might have drawn in favor of the prosecution. The evidence need not be inconsistent with every conclusion save that of guilt so long as the jury can find guilt beyond a reasonable doubt. Credibility

i

determinations are for a jury and not an appellate court. Finally, a jury verdict should be set aside only when the record contains no evidence, regardless of how it is weighed, from which the jury could find guilt beyond a reasonable doubt." Syl. Pt. 3, in part, *State v. Guthrie*, 194 W.Va. 657, 461 S.E.2d 163 (1995).

4. "The question of whether a person charged with a crime under West Virginia Code § 61-8D-5 (2010) is a custodian or person in a position of trust in relation to a child is a question of fact for the jury to determine." Syl. Pt. 4, *State ex rel. Harris v. Hatcher*, __ W.Va. __, 760 S.E.2d 847 (2014).

LOUGHRY, Justice:

The petitioner, Timothy C.,[1] appeals from the February 5, 2015, order of the

Circuit Court of Jackson County sentencing him to a total period of incarceration of fifty to

one hundred sixty-five years to be followed by thirty years of supervised release[2] for his

felony convictions on various sex offenses against two minor victims, M.C. and A.O.

Seeking to set aside his convictions, the petitioner challenges the trial court's exclusion of

DNA evidence; its admission of Rule 404(b) evidence;[3] and the sufficiency of the State's

evidence to establish that he was a "custodian" or "person in a position of trust"[4] as to victim

A.O. Following a careful review of the parties' arguments, the appendix record, and the

applicable law, this Court finds no reversible error regarding the petitioner's convictions

related to victim A.O., and we affirm those convictions. We do find error, however, in the

trial court's exclusion of the DNA evidence, which warrants a reversal of the petitioner's

---

[1]Consistent with our practice in cases involving sensitive matters, we use the first name and last initial of the petitioner and the adult witnesses at trial. *See* W.Va. R. App. P. 40(e)(1). We also use the initials of the child victims and the other minor witnesses at trial.

[2]*See* West Virginia Code § 62-12-26 (2014).

[3]*See* W.Va. R. Evid. 404(b)(2) (providing, in part, that evidence of crime, wrong, or other act "may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident").

[4]*See* W.Va. Code §§ 61-8D-1(4) & (13), -5(a) (2014).

1

convictions related to victim M.C. Accordingly, we remand this action to the circuit court for further proceedings solely on the counts involving victim M.C.

## I. Facts and Procedural Background

In October of 2013, a Jackson County grand jury returned an eleven-count indictment charging the petitioner with sex crimes involving his minor daughter, M.C., and a minor female neighbor, A.O. The first nine counts of the indictment involved M.C. and pertained to three separate incidents. For each incident, the petitioner was charged with one count of first degree sexual assault in violation of West Virginia Code § 61-8B-3(a)(2) (2014), one count of sexual abuse by a parent in violation of West Virginia Code § 61-8D-5(a) (2014), and one count of incest in violation of West Virginia Code § 61-8-12 (2014). The final two counts involved a single incident with A.O. for which the petitioner was charged with one count of first degree sexual abuse in violation of West Virginia Code § 61-8B-7(a)(3) (2014) and one count of sexual abuse by a custodian or person in a position of trust in violation of West Virginia Code § 61-8D-5(a).

Prior to trial, the State filed a motion seeking to compel a blood and/or a saliva sample from the petitioner. Possessing a shirt belonging to M.C.[5] on which semen had been

---

[5]It appears from the record that this shirt and a pair of pants were M.C.'s favorite pajamas.

found, the State asserted it "must obtain a blood and/or saliva sample of the Defendant for DNA testing[,]" noting the presence of semen was consistent with M.C.'s statement that the petitioner made her perform oral sex on him. The trial court denied the motion. Approximately one month later, the State filed a verified motion in which it argued that a minimally invasive saliva sample "could produce crucial evidence in support of the State's case." The State maintained that if the petitioner's semen were identified as being on the shirt M.C. "was wearing at the time of the alleged acts[,]" it would constitute relevant and corroborative evidence. The trial court granted the motion, and the petitioner provided a saliva sample.

Soon thereafter, the State filed a motion in limine seeking to exclude the introduction of the DNA test results at trial because they eliminated the petitioner as a potential donor of the semen. The State argued the evidence was irrelevant, overly prejudicial, and would violate the rape shield law.[6] In response, the petitioner maintained the absence of his DNA was relevant to support his defense of innocence; was critical to his defense; was potentially exculpatory evidence; and was crucial to his receipt of a fair trial.[7]

_____

[6]Our rape shield law is comprised of West Virginia Code § 61-8B-11(b) and Rule 412 of the West Virginia Rules of Evidence, which are discussed in section III., A., *infra*.

[7]In his response to the State's motion in limine, the petitioner also suggested that his brother, Jeremy C., was a possible source of the semen on M.C.'s shirt. Although Jeremy C. assisted law enforcement officers during their investigation and agreed to provide a DNA

(continued...)

3

The trial court granted the State's motion in limine on the basis that the rape shield law prohibited the introduction of the DNA results. Because M.C. only identified her father as the perpetrator, the trial court reasoned the identity of the perpetrator was not an issue. The trial court concluded that the possibility that someone else abused M.C. did not logically mean the petitioner had not.

The State also filed a pre-trial motion seeking to introduce Rule 404(b) evidence at trial from four minor females, E.A.,[8] R.E., M.W., and I.R., for the purpose of showing the petitioner's lustful disposition for children under *State v. Edward Charles L.,* 183 W.Va. 641, 398 S.E.2d 123 (1990).[9] The trial court conducted an *in camera McGinnis* hearing[10] during which the State presented the testimony of three of the four witnesses listed in its motion.[11] The petitioner presented the testimony of various witnesses in an attempt to discredit the testimony of the State's witnesses by showing inconsistencies between their

---

[7](...continued)
sample, it appears that a sample had not been collected at the time of the petitioner's trial.

[8]It appears from the appendix record that there was an ongoing criminal investigation concerning E.A.'s allegations against the petitioner.

[9]*Edward Charles L.* is discussed in section III., B., *infra.*

[10]*State v. McGinnis*, 193 W.Va. 147, 455 S.E.2d 516 (1994), is discussed in section III., B., *infra.*

[11]Although the fourth Rule 404(b) witness, I.R., did not testify during the *McGinnis* hearing, M.W. testified concerning her personal observations of what she believed to have been sexual conduct between the petitioner and I.R.

hearing testimony and their prior statements concerning the petitioner's alleged sexual misconduct toward them. He further presented testimony that criminal charges were never filed as to M.W. and the charges related to E.R. were dismissed.[12] Although the trial court ruled that E.A., E.R., and M.W. would be allowed to testify at trial, the State only offered the testimony of E.A. and E.R.

The petitioner's trial began on October 14, 2014. Seven witnesses were called by the State, including the two Rule 404(b) witnesses. Six witnesses were called by the defense.

M.C. testified at trial that her father put his penis inside her mouth.[13] According to M.C., this assault occurred while she and her older sister, K.S., were visiting their father for the weekend in the home of his girlfriend, Denise G., with whom he resided.[14] M.C. was seven years old at the time. During that same weekend, M.C. told K.S. what had

---

[12]The petitioner presented the testimony of the assistant prosecutor who had been involved in the charges brought against the petitioner based on R.E.'s allegations. While this witness testified that R.E. recanted her allegations, he also explained that R.E. was afraid of the petitioner and that there was a legitimate concern regarding the potential for emotional harm to her if they were to proceed with the prosecution.

[13]During M.C.'s testimony, she was aided by a picture she had drawn of herself, her father, and a male genital.

[14]The indictment charged that the assault occurred in July or August of 2013.

happened,[15] after which K.S. told Denise G. Following the disclosure, the petitioner and Denise G. took M.C. home to her mother.[16] When M.C. was asked whether she had denied the assault ever happened during this car-ride home, M.C. responded, "No."[17]

Regarding the victim, A.O., the evidence at trial showed the petitioner was a neighbor to A.O. and her family. One evening in July or August of 2013, the petitioner was in A.O.'s yard with A.O.'s grandmother while A.O. and her younger siblings were outside playing. A.O. was ten years old at the time. A.O. testified that after tiring, she laid down on the ground and fell asleep. A.O. described waking up slightly when she felt herself being carried. At first, she thought her grandmother, Kathy E.,[18] was carrying her, but she soon realized it was a man. According to A.O., the petitioner did not take her to her bedroom, although he knew where it was as he had been in it previously. Instead, he walked through the house and carried her to a porch, which she described as a toy room or sunroom, where

---

[15]It appears from the trial transcript that the disclosure was made while M.C. and K.S. were playing with A.O. at her house during this same weekend.

[16]M.C.'s mother, Amy C., testified at trial that she telephoned the police after M.C. was returned home and said her father had sexually assaulted her.

[17]Because M.C. only testified to a single episode of sexual misconduct, the State agreed to dismiss six of the nine counts involving M.C. at the close of its case in chief due to the lack of evidence to support those counts.

[18]Kathy E. adopted A.O. and her younger sister. She is also the guardian of their two younger siblings. Because A.O. referred to Kathy E. as her grandmother at trial, we will refer to Kathy E. as A.O.'s grandmother and to A.O. and her siblings as Kathy E.'s grandchildren for purposes of this opinion.

he laid her down on a bed. A.O. testified that while she was still half asleep, the petitioner lifted her hand and briefly placed it on his penis, moving her hand in a circular motion.[19] A.O. testified that she was soon fully awake at which point the petitioner "jumps back real fast and he says the 's—h' word, and he almost falls back into the toy box." At that point, A.O. told the petitioner she was no longer tired and ran out the front door of her home. She explained that she was scared and crying. A.O. then described how she peeked in the front door of her home and, upon seeing her grandmother coming in through the back door, she went back inside and into the bathroom where she continued to cry. A.O. testified that while she was in the bathroom, she thought she heard the petitioner approaching, so she jumped out of the bathroom window and climbed a tree, where she remained until she saw the petitioner leave her backyard. Although A.O. disclosed this incident to both M.C. and K.S. the following day, she explained that she did not tell her grandmother because her grandmother's brother had just died and because "Papa was real bad sick."[20]

Kathy E. testified at trial that the petitioner was a neighbor with whom she was friendly, explaining that her grandchildren played with his children. Regarding the evening

---

[19]The State first indicates in its appellate brief that the petitioner carried A.O. to her room where he then touched her vagina while she was sleeping. This statement has no support in the record. Later in its brief, the State describes the misconduct as the petitioner placing A.O.'s hand on his genitals, which is consistent with A.O.'s testimony at trial. However, the State continued to misstate where the misconduct occurred.

[20]Although unclear from A.O.'s testimony, it appears that "Papa" is her grandfather.

7

in question, she testified that she and the petitioner were in her yard while her grandchildren were outside playing. According to Kathy E., "when we got ready to take all the kids in to put them to bed," the petitioner picked up A.O., who had fallen asleep in the yard, and carried her into the house. Kathy E. assumed the petitioner was being "nice and polite" and "trying to be helpful." When questioned regarding how long the petitioner was in the house with A.O. before she went inside, Kathy E. was uncertain, indicating a "minute or so," but also stating it took her a little while to round up her other grandchildren because they did not want to stop playing.

Kathy E. further testified that she first learned of A.O.'s allegations against the petitioner when police officers appeared at her home. She explained that although A.O. had been saying the petitioner was "being mean[,]" she had assumed "it was where he was being rough playing with the kids." She further testified that the petitioner "was always horsing around with her [A.O.]."

The State also presented the testimony of the two Rule 404(b) witnesses: E.A. and R.E. E.A., who was eleven years old at the time of trial, testified that she spent the night with her friend, C.B., one of the petitioner's daughters, in the home of C.B.'s grandfather (the petitioner's father). E.A. stated that she, C.B., and the petitioner, who also spent the night, were lying on the bed of a pull-out couch in the living room watching "The Grinch

8

Who Stole Christmas." E.A. testified that after C.B. fell asleep, C.B.'s grandfather took C.B. to his bedroom. Later, as she began to fall asleep herself, E.A. felt the petitioner, who was shirtless, move closer to her and after placing her hand on his stomach, he then moved it down the front of his pants where he moved her hand around his penis. Thereafter, she was pretending to be asleep when the petitioner slowly put his hand up her dress and into her underpants, penetrating her vagina and hurting her. Afterwards, she went to the bathroom, and it hurt to urinate. At that point, E.A. asked the petitioner if she could call her father, saying she was "just really homesick." However, the petitioner would not allow her to do so, saying her father had to work the next day and did not need to be awakened. E.A. testified that although she assured the petitioner that her father would not mind if she called, the petitioner would still not allow her to make the call.[21] E.A. stated that as she tried to go back to sleep, the petitioner told her, "I know you know what I did, and if you tell anyone I'll kill your whole family," which made her feel afraid. The following morning, a small dog in the household bit E.A. on her chest through her clothing. E.A. testified that although she told the petitioner she was okay, he insisted on pulling her shirt down to see where she had been bitten, which scared her.

---

[21]The petitioner introduced evidence of a prior statement given by E.A. to police concerning her allegations against the petitioner. During her statement, EA. indicated that she telephoned her father once that night, after which the petitioner would not allow her use the phone again.

R.E., the other Rule 404(b) witness, is the petitioner's biological niece. She was fifteen years old at the time of trial. R.E. testified regarding three separate incidents involving the petitioner that occurred when she was eight or nine years old. Describing the first incident, R.E. said she had been asleep in her bed and was awakened when she felt someone's hand on her inner thigh. She saw it was the petitioner, who then squeezed her vagina through her underwear. R.E. stated she left her room and went to her mother's bedroom to sleep. Regarding a second incident, R.E. testified she was alone in the living room of her home watching television when the petitioner sat beside her on the couch, moved his hand up her leg, and squeezed her vagina. She again removed herself from the situation by leaving the living room and going upstairs. R.E. described a third incident that occurred while she was upstairs lying on her bed and watching television. The petitioner came into her room, lied down beside her on the bed, and asked her to feel his erect penis, which she could see through his clothes. She refused his request and went to her mother's room.

The State's final witness was Officer Brandon Thompson of the Ravenswood Police Department. Through Officer Thompson, the video recording of the petitioner's statement given to police during their investigation was admitted into evidence at trial.

10

Officer Thompson confirmed that the petitioner denied M.C.'s and A.O.'s allegations during the taking of his statement.[22]

The petitioner's witnesses at trial included his girlfriend, Denise G. Contrary to M.C.'s testimony, Denise G. testified that while she and the petitioner were driving M.C. home to her mother after M.C. disclosed her allegations, M.C. stated the assault never happened and asked, "[C]an we just go fishing now[?]" Denise G.'s daughter, Lauren G., testified that when she questioned A.O. about her allegations, A.O. told her the petitioner never touched her.[23] The petitioner also admitted into evidence transcripts of M.C.'s and A.O.'s testimony given during a child abuse and neglect hearing for the purpose of showing differences in their allegations against the petitioner.[24] Other evidence was presented by the petitioner to show inconsistencies in the statements given by the Rule 404(b) witnesses concerning their allegations against the petitioner and regarding the fact that the criminal charges arising from R.E.'s allegations were dismissed. The petitioner also presented testimony that R.E. had been encouraged by her mother to make false accusations against the petitioner. The petitioner did not testify in his defense.

---

[22]The video recording of the petitioner's statement was not made part of the appendix record.

[23]Lauren G. also testified that when Denise G. and Kathy E. were present, A.O. said the petitioner did place her hand on his penis.

[24]It appears from the appendix record that this abuse and neglect proceeding was instituted following the above-described allegations being made.

The jury returned its verdict finding the petitioner guilty on the five remaining counts of the indictment.[25] His post-trial motions for acquittal and a new trial were denied. A sentencing hearing was conducted after which the trial court sentenced the petitioner to a total of fifty to one hundred sixty-five years of incarceration[26] to be followed by thirty years of supervised release. This appeal followed.

## II. Standard of Review

The petitioner assigns evidentiary error at trial related to the exclusion of the DNA evidence and the admission of the Rule 404(b) evidence. We have long held that "[a] trial court's evidentiary rulings, as well as its application of the Rules of Evidence, are subject to review under an abuse of discretion standard." Syl. Pt. 4, *State v. Rodoussakis*, 204 W.Va. 58, 511 S.E.2d 469 (1998). Further,

> [t]he standard of review for a trial court's admission of evidence pursuant to Rule 404(b) involves a three-step analysis. First, we review for clear error the trial court's factual determination that there is sufficient evidence to show the other acts occurred. Second, we review *de novo* whether the trial

---

[25]*See supra* note 17.

[26]With regard to his crimes against M.C., the petitioner was sentenced to twenty-five to one hundred years incarceration for the first degree sexual assault; ten to twenty years incarceration for the sexual abuse by a parent; and five to fifteen years incarceration for incest. Regarding the crimes against A.O., the petitioner was sentenced to five to twenty-five years incarceration for first degree sexual abuse and ten to twenty years incarceration for sexual abuse by a custodian of a child. All sentences were ordered to run consecutively, with the exception of the sentence for incest, which was ordered to run concurrently with all other sentences. The trial court also imposed monetary fines.

court correctly found the evidence was admissible for a legitimate purpose. Third, we review for an abuse of discretion the trial court's conclusion that the "other acts" evidence is more probative than prejudicial under Rule 403.

*State v. Jonathan B.*, 230 W.Va. 229, 236, 737 S.E.2d 257, 264 (2012) (quoting *State v. LaRock*, 196 W.Va. 294, 310-11, 470 S.E.2d 613, 629-30 (1996)). The petitioner also challenges the sufficiency of the evidence on the count charging him with sexual abuse by a custodian or person in a position of trust involving victim A.O. It is axiomatic that

> [a] criminal defendant challenging the sufficiency of the evidence to support a conviction takes on a heavy burden. An appellate court must review all the evidence, whether direct or circumstantial, in the light most favorable to the prosecution and must credit all inferences and credibility assessments that the jury might have drawn in favor of the prosecution. The evidence need not be inconsistent with every conclusion save that of guilt so long as the jury can find guilt beyond a reasonable doubt. Credibility determinations are for a jury and not an appellate court. Finally, a jury verdict should be set aside only when the record contains no evidence, regardless of how it is weighed, from which the jury could find guilt beyond a reasonable doubt.

Syl. Pt. 3, in part, *State v. Guthrie*, 194 W.Va. 657, 461 S.E.2d 163 (1995).

Under these well-established standards, we proceed to determine whether the petitioner is entitled to relief from his convictions.

13

## III.  Discussion

The petitioner seeks to overturn his convictions based on evidentiary error at trial, as well as the sufficiency of the State's evidence to convict him on one of the two counts involving A.O.  We will address each of these assignments of error in turn.

### A.  DNA evidence

The petitioner argues the trial court abused its discretion by relying upon the rape shield law to prohibit the introduction of the DNA test results that eliminated him as a potential donor of the semen found on M.C.'s shirt.  Asserting that the rape shield law is intended to protect victims, rather than aid the State, the petitioner contends it must yield to an individual's constitutional right to a fair trial.  The petitioner maintains the State never explained how the introduction of this DNA evidence would circumvent the purpose behind the rape shield law by harassing M.C. or invading her privacy.  He emphasizes that this evidence did not suddenly become irrelevant and inadmissible simply because the test results were unfavorable to the State's case.  In summary, the petitioner argues that the DNA test results were highly probative and crucial to his defense; were admissible under Rule

14

404(a)(3)[27] of the West Virginia Rules of Evidence as evidence specifically related to the acts for which he was charged; and were necessary to prevent manifest injustice.

Relying upon Rule 412(b)(1), which provides that a trial court's admission of such evidence is permissive rather than mandatory, the State argues the trial court correctly excluded the DNA evidence because there is no question of identity in this matter given that M.C. only identified her father as the perpetrator. The State further argues that whether an unidentified male deposited semen on M.C.'s clothing at some other time is irrelevant, making its prejudicial effect to the State greater than its probative value to the petitioner. Lastly, the State maintains the petitioner was not denied his right to present a defense through the exclusion of the DNA test results since its admission would distract the jury from

---

[27]Although the petitioner cites Rule 404(a)(3), which is the old rape shield rule, by the time the petitioner's trial began on October 14, 2014, the rape shield provisions previously set forth in Rule 404(a)(3) of the West Virginia Rules of Evidence had been moved to the newly created Rule 412, which was effective September 2, 2014. Accordingly, Rule 412 was the applicable evidentiary rule at the time of the petitioner's trial. *See State v. Shingleton*, __ W.Va. __, __ S.E.2d __, 2016 WL 1192921, *5 n.15 (Mar. 24, 2016) (applying evidentiary rules in effect at time of defendant's trial). As explained in the official "comment," Rule 412 clarified existing law; provides "the standard for the introduction of evidence of a victim's sexual history;" and "supersedes the rape shield statute, W.Va. Code § 61-8B-11, to the extent that the statute is in conflict with the rule." W.Va. R. Evid. 412 cmt. (2014). West Virginia Code § 61-8B-11 (2014) provides, in part, that "evidence of specific instances of the victim's sexual conduct, opinion evidence of the victim's sexual conduct[,] and reputation evidence of the victim's sexual conduct shall not be admissible."

15

determining the merits of M.C.'s testimony by improperly causing it to focus on whether she

was sexually assaulted at some other time by some other individual.

We begin our analysis by observing that

> [t]he test used to determine whether a trial court's
> exclusion of proffered evidence under our rape shield law
> violated a defendant's due process right to a fair trial is (1)
> whether that testimony was relevant;[28] (2) whether the probative
> value of the evidence outweighed its prejudicial effect; and (3)
> whether the State's compelling interests in excluding the
> evidence outweighed the defendant's right to present relevant
> evidence supportive of his or her defense. Under this test, we
> will reverse a trial court's ruling only if there has been a clear
> abuse of discretion.

*Guthrie*, 205 W.Va. at 330, 518 S.E.2d at 87, syl. pt. 6 (footnote added). Further, an abuse

of discretion in evidentiary rulings is not reversible error if the trial court's error is harmless.

*See* W.Va. R. Crim. P. 52 ("Any error . . . which does not affect substantial rights shall be

disregarded."); Syl. Pt. 20, *State v. Thomas*, 157 W.Va. 640, 203 S.E.2d 445 (1974) ("Errors

involving deprivation of constitutional rights will be regarded as harmless only if there is no

reasonable possibility that the violation contributed to the conviction.").

---

[28]*See* W.Va. R. Evid. 401 (providing "[e]vidence is relevant if: (a) it has any tendency
to make a fact more or less probable than it would be without the evidence; and (b) the fact
is of consequence in determining the action.").

As the State correctly argues, Rule 412(b) of the West Virginia Rules of Evidence provides that the admission of evidence covered by our rape shield law is permissive, rather than mandatory, as follows:

> (1) Criminal Cases. — The court may admit the following evidence in a criminal case:
> (A) evidence of specific instances of a victim's sexual behavior, if offered to prove that someone other than the defendant was the source of semen, injury, or other physical evidence;
>
> • • • •
>
> (D) evidence whose exclusion would violate the defendant's constitutional rights.

In the instant matter, the petitioner sought to introduce the DNA test results at trial in support of his theory of innocence and to show that someone else was the source of semen on M.C.'s shirt, which would explain why seven-year-old M.C. was able to draw a picture of a male genital. These purposes clearly fall within the delineated exceptions set forth in Rule 412(b)(1). Indeed, once the DNA test results revealed that the petitioner was not a donor of the semen found on clothing being worn by M.C. at the time of the sexual assault, such evidence became potentially exculpatory for the petitioner. As a result, the DNA test results constituted relevant evidence because it clearly had "a tendency to make a fact more or less probable than it would be without the evidence[,]" which was of "consequence in determining the action." W.Va. R. Evid. 401. This satisfies the first factor to be examined under *Guthrie*, 205 W.Va. at 330, 518 S.E.2d at 87, syl. pt. 6, in part. It is equally clear that the probative value of the DNA evidence to the petitioner exceeds its prejudicial effect—which is the second *Guthrie* factor. *Id.*

17

The State argues that whether an unidentified male deposited semen on M.C.'s clothing at some other time is irrelevant, making the prejudicial effect greater than the probative value of such evidence. We disagree. In fact, the State's representation in its verified motion that the clothing being tested was worn by M.C. at the time she was sexually assaulted clearly served to elevate both the relevance and probative value of the DNA test results. While M.C. only identified her father as the perpetrator, because the petitioner's defense was his innocence, the identity-related information was critical to his defense. *See, e.g.*, *State v. Smith*, 856 A.2d 466 (Conn. App. Ct. 2004) (finding trial court erred when it prohibited defendant from offering expert testimony that someone else's sperm heads or semen were found on victim's body or clothing where such evidence was relevant to establishment of victim's assailant rather than victim's general unchaste character as prohibited by rape shield law).

Because of M.C.'s tender age at the time of the sexual assault, she was incapable of engaging in consensual sexual activity when semen was deposited on her shirt.[29] Therefore, we find the petitioner's intended purpose for this evidence does not thwart the goal of Rule 412, which "aims to safeguard the alleged victim against the invasion of privacy, potential embarrassment and sexual stereotyping that is associated with public

---

[29]*See* W.Va. Code § 61-8B-2(c)(1) (2014) (providing person less than sixteen years old is deemed incapable of consent).

disclosure of intimate sexual details and the infusion of sexual innuendo into the factfinding

process." W.Va. R. Evid. 412 cmt. (2014);[30] *see also Guthrie*, 205 W.Va. at 339, 518 S.E.2d

at 96 (stating purpose of our rape shield law is "to protect the victims of sexual assault from

humiliating and embarrassing public fishing expeditions into their sexual conduct[.]"). In

short, under the particular facts of this case, we find the balance of the probative value of this

evidence, which supports the petitioner's defense of innocence, outweighs its prejudicial

effect to the State.

---

[30]We have previously applied our rape shield law in cases involving minors. *See, e.g.*, *State v. Robert Scott R., Jr.*, 233 W.Va. 127, 54 S.E.2d 588 (2014) (finding no abuse of discretion in trial court's application of rape shield law to exclude evidence due to lack of relevant connection between victim possibly being sexually fondled by someone else when she was five and evidence that defendant repeatedly penetrated victim's vagina after she turned twelve); *State v. Jones*, 230 W.Va. 692, 742 S.E.2d 108 (2013) (upholding trial court's exclusion of evidence concerning victim's reports and statements of sexual misconduct committed against her by others under rape shield law); *State v. Quinn*, 200 W.Va. 432, 439, 490 S.E.2d 34, 41 (1997) (finding no abuse of discretion in trial court's reliance on rape shield law to prohibit cross-examination of victim concerning her statements that she had been victim of sexual misconduct by persons other than defendant where defendant's proffer "fell far short of showing a strong probability that [victim's] statements were false.").

In *State v. Wileman*, No. 14-0264, 2014 WL 6607732 (W.Va. Nov. 14, 2014, (memorandum decision), we upheld the trial court's reliance on the rape shield law to exclude evidence of other male DNA on sex toys in a criminal prosecution involving minor, teenaged victims. *Wileman* is factually distinguishable from the case at bar. In *Wileman*, the crimes occurred over a number of years and involved older children. The instant matter, however, involved one act of criminal conduct that allegedly occurred when the victim was wearing the shirt on which the semen was found. *Wileman* is similar to the extent the defendant was allowed to elicit testimony that his DNA was excluded from at least one of the sex toys. Here, the petitioner seeks to introduce the DNA test results that exclude him as a donor of the semen found on M.C.'s shirt.

Turning to the third *Guthrie* factor, we find that the State's compelling interests in excluding the evidence are outweighed by the petitioner's right to present relevant evidence which supports his defense. *Guthrie*, 205 W.Va. at 330, 518 S.E.2d at 87, syl. pt. 6, in part. While we recognize that evidentiary rulings are largely within the trial court's discretion, we have explained that

> a trial judge may not make an evidentiary ruling which deprives a criminal defendant of certain rights, such as the right to . . . offer testimony in support of his or her defense . . . which [is] essential for a fair trial pursuant to the due process clause found in the Fourteenth Amendment of the *Constitution of the United States* and article III, § 14 of the *West Virginia Constitution*.

Syl. Pt. 3, in part, *State v. Jenkins*, 195 W.Va. 620, 466 S.E.2d 471 (1995). Here, the State arduously pursued DNA testing on the basis that it could provide crucial, corroborative evidence. Then, once the testing produced unfavorable results, it sought to exclude the evidence, arguing it was irrelevant and highly prejudicial.[31] As the petitioner persuasively argues, if the presence of his DNA would be relevant to support M.C.'s allegations against him, then its absence was equally relevant to his claim of innocence and was crucial to his receipt of a fair trial.

---

[31]Although the DNA test results did not provide corroborative evidence for the State, we have previously held that "[a] conviction for any sexual offense may be obtained on the uncorroborated testimony of the victim, unless such testimony is inherently incredible[;] the credibility is a question for the jury." Syl. Pt. 5, *State v. Beck*, 167 W.Va. 830, 286 S.E.2d 234 (1981).

Based on the foregoing, we are compelled to find that the trial court abused its discretion in excluding the DNA test results, which necessarily deprived the petitioner of his due process right to a fair trial on the three counts of the indictment involving M.C. *See* W.Va. R. Evid. 412(b)(1)(D) (providing court may admit "evidence whose exclusion would violate the defendant's constitutional rights"). Because we cannot say there is no reasonable possibility that the exclusion of this evidence contributed to the petitioner's convictions involving M.C., we cannot find the error was harmless. *See Thomas*, 157 W.Va. at 643, 203 S.E.2d at 449, syl. pt. 20 ("Errors involving deprivation of constitutional rights will be regarded as harmless only if there is no reasonable possibility that the violation contributed to the conviction"). However, inasmuch as this evidentiary issue is unique to M.C., we further find this error was harmless as to the convictions involving A.O.

In *United States v. Bear Stops*, 997 F.2d 451 (8ᵗʰ Cir. 1993), the defendant was charged with sexually abusing two brothers, B.B. and P.M., ages four and six, respectively. The defendant challenged the district court's exclusion of evidence indicating that P.M. had been sexually abused by other persons around the same time as the charged conduct. The Court of Appeals found that the district court had abused its discretion and erred by excluding this evidence when it was "offered to provide an alternative explanation for the prosecution's persuasive evidence about P.M.'s behavioral manifestations of a sexually abused child." *Id.* at 457. The Court further found that the error was not harmless and

reversed the conviction as to P.M.  However, the Court affirmed the defendant's convictions involving B.B., disagreeing with the defendant's argument that this evidentiary error also warranted a reversal of his convictions involving B.B.[32]  The Court reasoned that the evidentiary issues were unique to P.M. and that the counts involving B.B. were "quite different from the one involving P.M."[33]  In further support of its decision, the Court stated that the absence of evidence of prior sexual abuse of B.B. meant there was "no valid basis to support an alternative explanation for why B.B. exhibited symptoms of a child who had been sexually abused."  *Id.* at 459.[34]

---

[32]The defendant was denied relief in his subsequent habeas proceeding.  *Bear Stops v. U.S.*, 339 F.3d 777 (8th Cir. 2003).

[33]In the count involving P.M., the defendant was charged with anal intercourse.  The counts directed to B.B. involved intentional touching of the boy's genitalia, groin, anus, and inner thigh with intent to abuse, humiliate, harass, and degrade B.B. and to arouse the defendant's sexual desire.  *Bear Stops*, 997 F.2d at 453.

[34]*Cf. U.S. v. Armstrong*, 621 F.2d 951 (9th Cir. 1980) (reversing one of three bank robbery convictions based on error in exclusion of testimony that another man, matching description of American National Bank robber, had used bait money taken in that robbery to purchase vehicle, but affirming other convictions finding overwhelming evidence linking defendant to Bank of America robbery and finding erroneous exclusion of evidence had no bearing on World Savings robbery); *State v. Lehr*, 38 P.3d 1172, 1181-183 (Ariz. 2002) (reversing convictions on counts involving three of several victims based on denial of right of confrontation due to limitations trial court placed on defendant's challenge to DNA evidence but also finding error harmless as to remaining victims given other evidence at trial and corroborating facts implicating defendant in those other crimes); *Stobbart v. State*, 533 S.E.2d 379 (Ga. 2000) (reversing conviction for malice murder and possession of firearm based on erroneous exclusion of evidence demonstrating murder victim's propensity for violence and finding such evidence to be  highly relevant to defendant's self-defense theory and, therefore, not harmless error, but affirming conviction for aggravated assault for pointing pistol at second victim who was present); *Price v. Commonwealth.*, 31 S.W.3d 885

(continued...)

22

Here, unlike the sexual assault of M.C., the sexual abuse of A.O. occurred at a different time, at a different location, and involved very different misconduct. The petitioner was charged with placing his penis inside the mouth of his seven-year-old daughter, M.C., while she was visiting in the home that he shared with his girlfriend. When seeking to introduce the DNA test results at trial, the petitioner specifically argued the evidence was crucial to his defense to M.C.'s allegations. In contrast, the counts involving A.O. occurred in A.O.'s home and involved the petitioner placing A.O.'s hand on his penis when he thought she was asleep. A.O.'s allegations were particularly supported by the Rule 404(b) evidence. Under these circumstances, we find the DNA test results of the sperm found on M.C.'s shirt arising out of an entirely separate incident is irrelevant and would have neither probative nor potentially exculpatory value regarding the charges involving A.O. Based upon our consideration of A.O.'s trial testimony, as well as the testimony of the Rule 404(b) witnesses, discussed below, we find the trial error in the exclusion of the DNA evidence is harmless as to the petitioner's convictions on the counts involving A.O.

---

[34](...continued)
(Ky. 2000) (reversing attempted rape conviction as to minor victim based on denial of right of confrontation where defendant was removed from courtroom and required to view her testimony on monitor in separate room, but affirming murder conviction of minor victim's mother on basis that minor victim gave no testimony regarding murder charge).

## B. Rule 404(b) evidence

The petitioner argues the trial court erred by allowing the State's Rule 404(b) evidence to be admitted at trial. He asserts this evidence was cumulative because the State was able to establish a lustful disposition toward children and lack of mistake through a joint trial with two testifying minor victims.[35] Arguing further, the petitioner contends the trial court failed to perform a Rule 403 balancing test[36] to determine whether the probative value of the evidence was outweighed by its potentially prejudicial effect.

In support of the trial court's ruling, the State argues the trial court engaged in a lengthy analysis of the State's Rule 404(b) evidence, which included its express reliance on the analysis required under *McGinnis* and Rule 403; its application of those principles to the 404(b) evidence presented by the State; and its express statement that its analysis turned

---

[35]There is no indication in the appendix record that the petitioner ever sought to sever the charges for trial purposes. Further, we find no merit in the petitioner's cumulative evidence argument. In numerous instances, we have upheld a trial court's admission of Rule 404(b) evidence in cases where there was a single trial involving multiple minor victims of sexual misconduct. *See, e.g.*, *State v. Rash*, 226 W.Va. 35, 697 S.E.2d 71 (2010); *State v. Spaulding*, No. 14-0718, 2015 WL 3875802 (W.Va. June 22, 2015) (memorandum decision); *Carl N. v. Ballard*, No. 13-0569. 2014 WL 1672954 (W.Va. Apr. 25, 2014) (memorandum decision); *State v. Mark Lynn J.*, No. 12-0272, 2013 WL 3185087 (W.Va. June 24, 2013) (memorandum decision); *Rash v. Plumley*, No. 12-0564, 2013 WL 2300956 (W.Va. May 24, 2013) (memorandum decision).

[36]*See* W.Va. R. Evidence 403 (2014) ("The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence.").

24

on "whether the relevancy of the evidence outweighs its prejudicial effect." The State argues the trial court correctly weighed the relevancy of the evidence against the potential for unfair prejudice and found the probative value of the evidence outweighed any prejudicial effect, as reflected in its twelve-page analysis of the issue. We concur.

In *Edward Charles L.*, our seminal case regarding the admission of evidence of lustful disposition toward children under Rule 404(b), this Court held:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. W.Va. R. Evid. 404(b).

*Edward Charles L.* 183 W.Va. at 643, 398 S.E.2d at 125, syl. pt. 1. We further held that

> [c]ollateral acts or crimes may be introduced in cases involving child sexual assault or sexual abuse victims to show the perpetrator had a lustful disposition towards the victim, a lustful disposition towards children generally, or a lustful disposition to specific other children provided such evidence relates to incidents reasonably close in time to the incident(s) giving rise to the indictment. To the extent that this conflicts with our decision in *State v. Dolin*, 176 W.Va. 688, 347 S.E.2d 208 (1986), it is overruled.

*Edward Charles L.,* 183 W.Va. at 643, 398 S.E.2d at 125, syl. pt. 2. A few years later, this Court again addressed the admissibility of Rule 404(b) evidence in *State v. McGinnis*, 193 W.Va. 147, 455 S.E.2d 516 (1994), wherein the Court held:

25

Where an offer of evidence is made under Rule 404(b) of the West Virginia Rules of Evidence, the trial court, pursuant to Rule 104(a) of the West Virginia Rules of Evidence, is to determine its admissibility. Before admitting the evidence, the trial court should conduct an *in camera* hearing [and] . . . [a]fter hearing the evidence and arguments of counsel, the trial court must be satisfied by a preponderance of the evidence that the acts or conduct occurred and that the defendant committed the acts. . . . If a sufficient showing has been made, the trial court must then determine the relevancy of the evidence under Rules 401 and 402 of the West Virginia Rules of Evidence and conduct the balancing required under Rule 403 of the West Virginia Rules of Evidence.

*McGinnis*, 193 W.Va. at 151, 455 S.E.2d at 520, syl. pt. 2, in part. Expressly linking *Edward Charles L.* with *McGinnis*, we have made clear that

[w]here an offer has been made of lustful disposition evidence pursuant to *State v. Edward Charles L.*, 183 W.Va. 641, 398 S.E.2d 123 (1990), the reviewing court must evaluate the admissibility of that evidence as required by *Edward Charles L.* and *State v. McGinnis*, 193 W.Va. 147, 455 S.E.2d 516 (1994).

Syl. Pt. 3, *State v. Jonathan B.*, 230 W.Va. 229, 737 S.E.2d 257 (2012).

Here, the trial court conducted a *McGinnis* hearing on the Rule 404(b) evidence being offered by the State to demonstrate the petitioner's lustful disposition for children under *Edward Charles L.* During this hearing, the trial court heard the testimony of three minor females, each of whom described how she was sexually abused or assaulted by the petitioner. The trial court also heard counsel's cross-examination of these witnesses, as well as the testimony of other witnesses, through which the petitioner sought to discredit the

testimony of the Rule 404(b) witnesses by showing inconsistencies in their respective allegations against the petitioner and to highlight the fact that the criminal charges arising out of R.E.'s allegations were dismissed.[37]

Following the *McGinnis* hearing, the trial court thoroughly analyzed the admissibility of the Rule 404(b) evidence, as reflected in its order entered March 31, 2014. The trial court set forth precisely what its analysis would entail, including a determination regarding the relevancy of the evidence, as well as whether the abuse occurred and, if so, whether the petitioner committed the abuse. Importantly, as the State has pointed out, the trial court explained that its analysis hinged on "whether the relevancy of the evidence outweigh[ed] its prejudicial effect."

After recounting the hearing testimony given by the State's Rule 404(b) witnesses, as well as the petitioner's efforts to discredit their testimony, the trial court found the variations in the witnesses' respective accounts of their abuse by the petitioner were insignificant. Directing its attention to the totality of the circumstances, the trial court found the petitioner's self-serving denials of the abuse in his statements to those who investigated the allegations did not disprove the veracity of the Rule 404(b) witnesses. The trial court concluded the evidence was sufficient to demonstrate that the alleged sexual abuse of E.A.,

---

[37]*See supra* note 12.

R.E. and M.W. was more likely to be true than not and that the petitioner was the perpetrator.

The trial court also found, however, that the State had failed in its burden with regard to the

fourth potential Rule 404(b) witness, I.R.  The trial court noted that although M.W. testified

concerning what she personally perceived to have been a sexual act between I.R. and the

petitioner, there was no direct evidence of that act because I.R. did not testify at the

*McGinnis* hearing.

Next, the trial court proceeded to determine whether the 404(b) evidence would

be admitted at trial.  Observing the need to ascertain "whether the relevancy of the evidence

outweighs its prejudicial effect[,]" and recognizing that the "relevancy of said evidence goes

hand-in-hand with the specific purposes for which the State seeks admission[,]" the trial

court ruled that the evidence of prior sexual abuse was relevant to show the petitioner's

lustful disposition towards children, as well as the absence of mistake or accident on the part

of the petitioner.  Explaining further, the trial court stated:

> The [petitioner's] lustful disposition toward minor females, and the absence of mistake on the part of the [petitioner] is illustrated in the similarities between the alleged victims in the [instant prosecution] and the 404(b) witnesses. . . . With the exception of M.C., each of the girls described the [petitioner] sexually abusing them while they were asleep or while they appeared to be sleeping.
> The similarities in statements is especially profound when it is considered that E[].A., R[].E., and M[].W. each testified that they ha[d] not spoken about their respective claims with one another. . . .

> The likeness in accounts and lack of interaction . . . not only increases the credibility of each individual accuser, but also established the relevancy of their testimony.

Our analysis of this issue "is limited to . . . whether the trial court acted in a way that was so arbitrary and irrational that it can be said to have abused its discretion." *McGinnis*, 193 W.Va. at 159, 455 S.E.2d at 528. Critically, we review "the admission of Rule 404(b) evidence in the light most favorable to the party offering the evidence, in this case the prosecution, maximizing its probative value and minimizing its prejudicial effect." *Id.* Applying these standards to our review of the hearing transcript and the trial court's related analysis, we readily determine that the trial court met the requirements of *Edward Charles L.* and *McGinnis* in ruling that the State would be allowed to present the testimony of three of the State's four Rule 404(b) witnesses during the petitioner's trial.[38] Accordingly, we find no error in this regard.

## C. Sufficiency of the Evidence

The petitioner asserts that the trial court erred when it failed to acquit him on the single count charging sexual abuse by a custodian or person in a position of trust in relation to victim A.O. at the close of the State's case-in-chief. Challenging the sufficiency

---

[38]As indicated previously, at trial the State ultimately presented the testimony of only two of the three Rule 404(b) witnesses.

of the State's evidence, the petitioner argues there was no evidence demonstrating he fell within the statutory definitions of "custodian" or "person in a position of trust." He asserts A.O. was being supervised by her grandmother when he carried A.O. into her home, and that A.O.'s grandmother never relinquished, nor intended to relinquish, care, custody, or control of A.O. to him.

The State responds that it presented sufficient evidence on this issue, which must be viewed in the light most favorable to the prosecution. Recounting its evidence at trial, the State asserts the petitioner assisted A.O.'s grandmother, Kathy E., in supervising her grandchildren who were playing in her yard on the evening in question. The State also describes its evidence demonstrating the petitioner's history of associating with A.O. and her siblings. The State maintains that the petitioner acted in the place of a parent by assuming responsibility to help round up the children after they had been playing outside, which included picking up A.O., who had fallen asleep, and carrying her into her home for her grandmother. We agree.

Although the petitioner was indicted for being a custodian or person in a position of trust regarding A.O., and while the petitioner and the State both present arguments as to why the petitioner was, or was not, a custodian or person in a position of trust as to A.O., the trial transcript reflects that the jury was only instructed on whether the

30

petitioner was a custodian of A.O. at the time of the charged conduct. Accordingly, our analysis will necessarily be restricted to whether the State's evidence was sufficient for the jury to find that the petitioner was a custodian of A.O. at the time of the offense.

A "custodian" is defined, in pertinent part, as "a person over the age of fourteen years who has or shares actual physical possession or care and custody of a child on a full-time or temporary basis, regardless of whether such person has been granted custody of the child by any contract, agreement or legal proceeding." W.Va. Code § 61-8D-1(4) (2014). Importantly, "[t]he question of whether a person charged with a crime under West Virginia Code § 61-8D-5 (2010) is a custodian or person in a position of trust in relation to a child is a question of fact for the jury to determine." Syl. Pt. 4, *State ex rel. Harris v. Hatcher*, __ W.Va. __, __, 760 S.E.2d 847, 853 (2014).

We have previously upheld convictions involving sexual crimes perpetrated against a minor in cases where the defendant had no specific relation to the victim but merely knew or was acquainted with the child. For example, in *State v. Collins*, 221 W.Va. 229, 654 S.E.2d 115 (2007), an eleven-year-old girl and her mother were living with the defendant's parents. Although the defendant did not reside in his parents' home, he was a frequent visitor and, on multiple occasions, took the child four-wheeling. On one such occasion, the defendant forced the child to perform oral sex on him. The jury found the defendant to be

31

guilty of sexual abuse by a parent, guardian, or custodian in violation of West Virginia Code § 61-8D-5. In upholding the jury's verdict on sufficiency of the evidence grounds, this Court observed that "persons in temporary physical control of children" could be deemed custodians.[39] *Collins*, 221 W.Va. at 234, 654 S.E.2d at 120; *see also State v. Edmonds*, 226 W.Va. 464, 469, 702 S.E.2d 408, 413 (2010) (upholding conviction where school maintenance worker took student to house he was remodeling where he sexually assaulted her).

In the instant matter, the jury had before it testimony demonstrating the level of familiarity between the petitioner, A.O., and A.O.'s family. The petitioner was a neighbor and his children played with A.O. and her siblings. They enjoyed an amicable relationship. Similar to the defendant in *Collins*, the petitioner visited A.O.'s home and had previously been in A.O.'s bedroom. The evidence at trial also showed that the petitioner frequently played with A.O. and her siblings. In fact, when Kathy E. was questioned at trial concerning the fact she was unaware of A.O.'s allegations until police officers appeared at her home, she testified that although A.O. had been saying the petitioner was "being mean[,]" she assumed

---

[39]The petitioner relies, in part, on *State v. Longerbeam*, 226 W.Va. 535, 703 S.E.2d 307 (2010), for the proposition that he was neither a "custodian" nor a "person in a position of trust" to A.O. We find *Collins* to be more factually similar to the instant matter; as we previously explained, "these cases are fact-intensive by nature." *Harris*, __ W.Va. at __, 760 S.E.2d at 853.

"it was where he was being rough playing with the kids." As she further explained, "[the petitioner] was always horsing around with [A.O.]."

Regarding the evening in question, Kathy E. testified that the petitioner was in her yard while her grandchildren were outside playing. She further testified that "when we got ready to take all the kids in to put them to bed," the petitioner took it upon himself to carry A.O. into her house. Although Kathy E. did not ask the petitioner to carry A.O. into her home, "acceptance of supervisory responsibility can come in words, actions, and course of conduct." *State v. Chic-Colbert*, 231 W.Va. 749, 762, 749 S.E.2d 642, 655 (2013). Through his actions, the petitioner assumed "temporary physical control"[40] of A.O. at a time when she was particularly vulnerable because she was sleeping.[41]

The petitioner's trial counsel had a full opportunity during closing arguments to try to persuade the jury that the evidence did not establish that the petitioner was a custodian of A.O. Applying the stringent standards set forth in *Guthrie* to the State's

---

[40]*Collins*, 221 W.Va. at 234, 654 S.E.2d at 120.

[41]*See, e.g.*, *Wassillie v. State*, 911 P.2d 1071,1073 (Alaska 1996) (recounting trial judge's finding that child victim was "particularly vulnerable because she was asleep when [the defendant] molested her"); *Yelverton v. State*, 403 S.E.2d 816 (Ga. 1991) (describing children as "vulnerable" due to age or sleep with regard to nonconsensual sexual conduct against them); *State v. Kony*, No. CAAP-12-0001114, 320 P.3d 417 (Table) (Haw. Ct. App. Feb. 28, 2014) (recounting psychologist's trial testimony describing sleeping child as being in vulnerable position).

evidence at trial, and viewing all of the evidence in the light most favorable to the prosecution, we conclude there was sufficient evidence for the jury to convict the petitioner of being a custodian at the time he sexually abused A.O.

## IV. Conclusion

For the reasons set forth above, the petitioner's convictions of first degree sexual assault, incest, and sexual abuse by a parent in relation to M.C. are reversed, and the case is remanded for further proceedings consistent with this opinion. The petitioner's convictions of first degree sexual abuse and sexual abuse by a custodian in relation to A.O. are hereby affirmed.[42]

Affirmed, in part; Reversed, in part; and Remanded.

---

[42]As part of the petitioner's sentencing, the trial court imposed a period of supervised release pursuant to West Virginia Code § 62-12-26. In light of our ruling today, we leave to the trial court's discretion whether the period of supervised release should be altered on remand.