**STATE OF WEST VIRGINIA
SUPREME COURT OF APPEALS**

**FILED
April 26, 2021**

EDYTHE NASH GAISER, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

**State of West Virginia,
Plaintiff Below, Respondent**

**vs.)  No. 19-1030** (Monongalia County 18-F-312)

**Timmy Crockett,
Defendant Below, Petitioner**


**MEMORANDUM DECISION**


Petitioner Timmy Crockett, by counsel Robert F. Evans, appeals the October 17, 2019, order of the Circuit Court of Monongalia County denying petitioner's post-trial motion for judgment of acquittal or, alternatively, a new trial. Respondent the State of West Virginia, by counsel Elizabeth Grant, filed a response in support of the trial court's order. Petitioner filed a reply.

This Court has considered the parties' briefs and the record on appeal. The facts and legal arguments are adequately presented, and the decisional process would not be significantly aided by oral argument. Upon consideration of the standard of review, the briefs, and the record presented, the Court finds no substantial question of law and no prejudicial error. For these reasons, a memorandum decision affirming the order of the trial court is appropriate under Rule 21 of the Rules of Appellate Procedure.

Petitioner was indicted on one count of sexual assault in the second degree for the assault of a student athlete ("the victim") at West Virginia University ("WVU"), in the early morning hours of March 9, 2018, in Monongalia County, West Virginia. The indictment alleged petitioner subjected the victim "to an act of sexual intercourse by forcible compulsion and/or while [the victim] was physically helpless." Throughout the proceedings below, petitioner admitted to having sex with the victim, but he claimed that she was conscious at the time and that the encounter was consensual.

Before his trial, petitioner filed a motion in limine asking that the trial court permit him to introduce certain DNA evidence during his trial. The motion stated:

> On or about March 8, 201[8] [petitioner] met the victim out for drinks upon the victim's request through a mutual friend[1] . . . Upon the conclusion of the

---

[1] The mutual friend is a gay male.

evening the parties separated with the mutual friend and the victim going back to the victim's apartment. [Petitioner] ultimately ended up having sex with the victim. After [petitioner] left the apartment the victim apparently went to bed for the evening. She went to the hospital the next morning stating the sex was not consensual.

(footnote added). The motion noted that various parts of the victim's body were swabbed for DNA evidence during her examination at the hospital. Petitioner stated that testing revealed that the DNA of at least two male contributors was found on the swab of the victim's neck, and he asked that he be permitted to introduce this evidence at trial, arguing that "[t]he jury must hear that additional DNA was present and make their own determination if someone other than [petitioner] had sex with the victim." Petitioner asserted that the DNA evidence was admissible under Rule 412 of the West Virginia Rules of Evidence.[2] The State opposed the motion, asserting that the evidence was irrelevant and inadmissible under the rape shield law.[3] The trial court agreed with the State and entered an order on June 13, 2019, denying petitioner's motion.

Petitioner filed a second motion in limine seeking to exclude evidence that "[t]he victim obtained a personal safety order against the [petitioner] in magistrate court."[4] During the hearing on the motion, petitioner's counsel argued, "I certainly think if you look at it from an evidentiary 403 perspective, the probable [sic] value does not outweigh the potential for prejudice. The jury hearing that another tribunal has felt that [petitioner] did something wrong[.]" The State objected to the motion, arguing that evidence that the victim obtained a personal safety order against petitioner was relevant. In ruling on the motion, the trial court said, "It may prove his guilt. . . . The State cannot put on evidence that there was a protective order [sic] [against petitioner]. Now, if it comes in some other way other than -- you know, then it can possibly come in." The trial court granted petitioner's second motion in limine in the June 13, 2019, order.

Petitioner's jury trial began on June 27, 2019. The jury heard testimony from the victim; a mutual friend of the victim and petitioner; the director of operations for the victim's sports team at WVU ("the director"); the senior associate athletic director at WVU; a forensic scientist with the West Virginia State Police laboratory; a sexual assault nurse examiner ("SANE"); a detective with the Granville Police Department; and petitioner.

---

[2] Rule 412 of the West Virginia Rules of Evidence is discussed *infra*.

[3] "Our rape shield law is comprised of West Virginia Code § 61-8B-11(b) and Rule 412 of the West Virginia Rules of Evidence[.]" *State v. Timothy C.*, 237 W. Va. 435, 439 n.6, 787 S.E.2d 888, 892 n.6 (2016).

[4] A person may seek a personal safety order against another person by filing a petition with the magistrate court alleging the other person has committed "a sexual offense or attempted sexual offense," has engaged in harassment as described in West Virginia Code § 61-2-9a(a), or has made "repeated credible threats of bodily injury when the person making the threats knows or has reason to know that the threats cause another person to reasonably fear for his or her safety." W. Va. Code § 53-8-4(a).

Testimony provided at trial established that on the evening of March 8, 2018, the victim, the mutual friend, and petitioner met at a bar in Morgantown, West Virginia. The mutual friend introduced the victim to petitioner, and petitioner bought them all food and alcoholic drinks. The trio then walked to a second bar in Morgantown and continued drinking until the victim decided she wanted to go home in the early morning hours of March 9, 2018. Although petitioner offered to arrange a ride for the victim, she declined the offer and drove herself and the mutual friend back to her apartment. Upon arriving at her apartment, the victim changed into a bra, underwear, and a bathrobe, and she got into her bed. Shortly thereafter, the victim became ill, vomiting into a trash can next to her bed.[5] She testified that she then blacked out.

After the victim became ill, the mutual friend sent a message to petitioner, asking him to come to the victim's apartment. The mutual friend testified that he asked petitioner to come help him care for the victim. The mutual friend provided petitioner with directions to the apartment, and upon his arrival petitioner joined the victim and the mutual friend in the victim's bedroom. At the time, the victim was in her bed, and the mutual friend was in a chair adjacent to the bed. The victim testified she was unconscious when petitioner arrived. She further testified:

So I felt someone on top of me. I felt someone kissing on me. And I felt penetration. I could not open my eyes. I was still kind of unconscious. Initially, God honest truth, I thought it was [the mutual friend] and I remember saying, "Stop," you know, "Get off. I want to go to sleep." And once he had finally stopped, I -- the door opened in my room. The kitchen is right by my room. The light in the kitchen shined in my room. And I was able to open my eyes. As blurry as it was, I saw two shadows in my room. That's when I immediately put my face in the pillow. I just started crying and I kept telling myself, I'm like, "Don't say anything. Don't wake up. Don't let them see you." Because I didn't know what had happened. And I guess I kind of just dozed right back off.

The next morning -- the next morning, I had got up, rolled over. [The mutual friend] was laying in my bed with boxers on, just nothing but boxers. That night when I did see two shadows, I saw [the mutual friend] kissing on another man. And so me waking up that morning -- and after seeing him, I just -- I felt hung over. The first thing -- my instinct, I had practice. I was going to get up and get in the shower. I go get in the shower, and there was -- I go get in the shower and there's blood. And I immediately closed the door. I called my director of [] operations, and I told him, I think something had happened to me.

The mutual friend and petitioner both testified that the victim was conscious and spoke with petitioner before the sexual encounter. They also testified that the sexual encounter between the victim and petitioner was consensual, and that the petitioner left shortly after the sexual encounter ended. The mutual friend testified that he was trying to sleep in the chair while petitioner had sex with the victim. It was undisputed that the mutual friend is gay, and no testimony was presented during petitioner's trial indicating that the mutual friend and the victim had ever engaged

---

[5] The evidence indicated that the vomit-filled trash can remained next to the victim's bed throughout the night.

in sexual contact with each other.

After the victim called him, the director drove to the victim's apartment. He transported petitioner to Ruby Memorial Hospital where she underwent a sexual assault examination. The examination revealed a "suction bite mark" on the victim's right breast, a suction or bite injury to her neck, bruises on her inner left thigh and the back of her arm, and a bleeding abrasion on the victim's posterior vaginal wall. The male DNA collected from the victim's breasts and vagina was consistent with petitioner's DNA profile. The mutual friend was excluded as the donor of the male DNA collected from the victim's breasts and vagina.

The director testified that after the victim's examination at the hospital, he took her to the Monongalia courthouse. The State questioned the director as follows:

> Q.      Okay. And so after her SANE examination was complete, did she come back with you?
> A.      Yes. So at that point in time, we were just sort of, you know, talking to the police officers, who were great. We talked about what are the next steps we should do to protect her, you know. And we went down to the courthouse here and filed a temporary protective order [sic] against [petitioner] and [the mutual friend].
> Q.      And to your knowledge, were those granted? If you can't answer, just say it.
> A.      I can't.

Petitioner's counsel objected, stating, "This was clearly ruled upon that there would be no reference to a protective order [sic] filed against [petitioner]. The [c]ourt said no. She just asked him, and he said, yes." Petitioner then requested that the trial court declare a mistrial. The State responded:

> I would argue that this isn't unfairly prejudicial to the jury. This witness didn't even know the answer to my question. In addition to that, he's cross-examined the victim on protective order [sic] issues. And so I acknowledge the [c]ourt's previous ruling and apologies to the [petitioner] and to the [c]ourt. But I don't think this is cause for a mistrial.

The trial court refused to declare a mistrial and, at petitioner's request, gave the following curative instruction to the jury: "The last question asked of the prosecuting attorney was objected to. And I granted that objection. In other words, I sustained it. Therefore, you should act as if you never heard the question or the witness's answer." Thereafter, the State continued to question the director about what happened at the courthouse. The director testified that the victim was visibly upset and that she collapsed in a restroom.

Petitioner's motions for judgment of acquittal made during the trial were denied. After deliberating for approximately two hours and fifteen minutes, the jury returned its verdict, finding petitioner guilty of sexual assault in the second degree. By order entered on October 17, 2019, the trial court ordered that petitioner serve a sentence of ten to twenty-five years of incarceration.

Petitioner filed a post-trial motion for judgment of acquittal or, alternatively, a new trial. First, petitioner argued that he was entitled to acquittal or a new trial on the ground that the State introduced evidence concerning a personal safety order against petitioner during the trial in violation of the trial court's June 13, 2019, pretrial order. Petitioner asserted the director's testimony was prejudicial and that it was not remedied by a curative instruction. Second, petitioner argued that the trial court denied him his right to a fair trial by excluding the DNA evidence obtained from the swab of the victim's neck.

By a second order entered on October 17, 2019, the trial court denied petitioner's post-trial motion. With regard to the director's testimony, the trial court noted, "No evidence regarding a judicial determination related to the [personal safety] order was ever admitted," and "the State's question relating to the victim seeking a [personal safety] order against [petitioner] did not create manifest necessity to discharge the jury." The trial court further found "that the jury did not convict the [petitioner] on the question posed by the State and that there was sufficient other evidence upon which to find the [petitioner] guilty." With regard to the DNA evidence obtained from the swab of the victim's neck, the trial court reasoned: "The defense offered in this case was consent. The DNA identified on the victim's vagina was found to only have one male contributor, the [petitioner]. Evidence of a second contributor on the victim's neck would have been irrelevant and possibly violative of the Rape Shield Law."

Petitioner now appeals the trial court's October 17, 2019, order denying his post-trial motion for judgment of acquittal or, alternatively, a new trial. He claims that errors committed by the trial court warrant the reversal of his conviction.

This Court reviews a trial court's order denying a motion for judgment of acquittal de novo. *See State v. LaRock*, 196 W. Va. 294, 304, 470 S.E.2d 613, 623 (1996) ("The trial court's disposition of a motion for judgment of acquittal is subject to our *de novo* review; therefore, this Court, like the trial court, must scrutinize the evidence in the light most compatible with the verdict, resolve all credibility disputes in the verdict's favor, and then reach a judgment about whether a rational jury could find guilt beyond a reasonable doubt."). The Court applies the following standard of review to a trial court's order denying a motion for a new trial:

> In reviewing challenges to findings and rulings made by a circuit court, we apply a two-pronged deferential standard of review. We review the rulings of the circuit court concerning a new trial and its conclusion as to the existence of reversible error under an abuse of discretion standard, and we review the circuit court's underlying factual findings under a clearly erroneous standard. Questions of law are subject to a de novo review.

Syl. Pt. 3, *State v. Vance*, 207 W. Va. 640, 535 S.E.2d 484 (2000).

In his first assignment of error, petitioner argues that the trial court erred by refusing to declare a mistrial after the State introduced evidence of a personal safety order entered against petitioner. Petitioner asserts that the evidence was unfairly prejudicial because the risk of unfair prejudice created by the admission of the evidence substantially outweighed its probative value, because the trial court's pretrial order specifically prohibited introduction of any evidence of the

personal protective order, and because the State drew inferences to the personal safety order against petitioner after the trial court instructed the jury to disregard the evidence.

We review a trial court's decision to grant or deny a motion for mistrial under an abuse of discretion standard. *State v. Lowery*, 222 W. Va. 284, 288, 664 S.E.2d 169, 173 (2008). A trial court is empowered to declare a mistrial only when

> there is a "manifest necessity" for discharging the jury before it has rendered its verdict. This power of the trial court must be exercised wisely; absent the existence of manifest necessity, a trial court's discharge of the jury without rendering a verdict has the effect of an acquittal of the accused and gives rise to a plea of double jeopardy.

*Id.* (quoting *State v. Williams*, 172 W. Va. 295, 304, 305 S.E.2d 251, 260 (1983)). "Before a manifest necessity exists which would warrant the declaring of a mistrial and the discharging of the jury and ordering a new trial, the circumstances must be prejudicial, or appear to be prejudicial, to the accused . . . ." Syl. Pt. 3, *State ex rel. Brooks v. Worrell*, 156 W. Va. 8, 190 S.E.2d 474 (1972). In evaluating whether prejudice giving rise to a manifest necessity exists, the Court considers remedial measures taken by the trial court, such as the giving of a curative instruction. *See Lowery*, 222 W. Va. at 288-89, 664 S.E.2d at 173-74 (finding that a spectator's "brief outburst, followed by an immediate ejection of the spectator from the courtroom, and a curative instruction, did not create a manifest necessity for a declaration of a mistrial").

We conclude that the trial court did not abuse its discretion by refusing to declare a mistrial. No evidence was presented during petitioner's trial—through the director or any other witness— indicating or implying that the victim *obtained* a personal safety order against petitioner. The testimony established only that the victim *applied* for a personal safety order. The introduction of this evidence—that the victim applied for a personal safety order—was not prohibited by the pretrial order, and it was both highly relevant and probative to explaining the victim's behavior and demeanor following the assault.[6] Thus, the pretrial order was not violated.[7] Had any prejudice resulted from the State's question as to whether the victim obtained a personal safety order, any such prejudice would have been marginal, at most, and it would have been entirely mitigated by the court's curative instruction. Therefore, we can find no prejudice, or even the appearance of prejudice, that would have amounted to a manifest necessity for the declaration of a mistrial.

To the extent that petitioner claims that testimony concerning the victim's presence at the courthouse was unfairly prejudicial, even if such testimony did not violate the pretrial order, we

---

[6] *See* W. Va. R. Evid. 401 (stating that "[e]vidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action.").

[7] We find that it was improper for the State to ask the director whether the victim had obtained a personal safety order against petitioner; however, the question did not result in the admission of evidence in violation of the trial court's order, and the State apologized for the question, explaining the question was inadvertent.

6

disagree. As noted above, the questioning was both relevant and probative. Its probative value far outweighed any danger of unfair prejudice. *See* W. Va. R. Evid. 403 ("The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice[.]"). Consequently, a manifest necessity for the declaration of a mistrial was not created by the admission of this evidence, and the trial court did not err by denying petitioner's motion for judgment of acquittal or for a new trial on this ground.

In his second and final assignment of error, petitioner argues that the trial court erred by excluding evidence of the DNA of a second male donor discovered on the victim's neck. Petitioner claims that "the DNA of another male being present on the [victim]'s neck makes it more probable that another male is guilty of the offense for which Petitioner stands convicted." He asserts that the evidence was admissible under our rape shield law and that there is a reasonable possibility that the exclusion of the DNA evidence contributed to his conviction. He further claims that the exclusion of the evidence deprived him of his due process right to a fair trial under the United States and West Virginia Constitutions.

We have previously held that "[a] trial court's evidentiary rulings, as well as its application of the Rules of Evidence, are subject to review under an abuse of discretion standard." Syl. Pt. 4, *State v. Rodoussakis*, 204 W. Va. 58, 511 S.E.2d 496 (1998); *see also* Syl. Pt. 2, *State v. Peyatt*, 173 W. Va. 317, 315 S.E.2d 574 (1983) ("'Rulings on the admissibility of evidence are largely within a trial court's sound discretion and should not be disturbed unless there has been an abuse of discretion.' *State v. Louk*, [171] W.Va. [639], [643], 301 S.E.2d 596, 599 (1983)[, *overruled on other grounds by State v. Jenkins*, 191 W. Va. 87, 443 S.E.2d 244 (1994)]."). Thus, we review the circuit court's decision to exclude the DNA evidence for an abuse of discretion.

Our rape shield law exists "to protect the victims of sexual assault from humiliating and embarrassing public fishing expeditions into their sexual conduct; to overcome victims' reluctance to report incidents of sexual assault; and to protect victims from psychological or emotional abuse in court as the price of their cooperation in prosecuting sex offenders." *State v. Guthrie*, 205 W. Va. 326, 339, 518 S.E.2d 83, 96 (1999). Under our rape shield law,

> [t]he following evidence shall not be admissible in a civil or criminal proceeding involving alleged sexual misconduct:
> (1) evidence offered to prove that a victim engaged in other sexual behavior;
> (2) evidence offered to prove a victim's sexual predisposition; or
> (3) evidence of specific instances of the victim's sexual conduct, opinion evidence of the victim's sexual conduct and reputation evidence of the victim's sexual conduct in any prosecution in which the victim's lack of consent is based solely on the incapacity to consent because such victim was below a critical age, mentally defective, or mentally incapacitated.

W. Va. R. Evid. 412(a). Certain evidence is admissible under the rape shield law:

> (A) evidence of specific instances of a victim's sexual behavior, if offered to prove that someone other than the defendant was the source of semen, injury, or other physical evidence; [and]

7

. . . .

(D) evidence whose exclusion would violate the defendant's constitutional rights.

W. Va. R. Evid. 412(b), in part.

> "The test used to determine whether a trial court's exclusion of proffered evidence under our rape shield law violated a defendant's due process right to a fair trial is (1) whether that testimony was relevant; (2) whether the probative value of the evidence outweighed its prejudicial effect; and (3) whether the State's compelling interests in excluding the evidence outweighed the defendant's right to present relevant evidence supportive of his or her defense. Under this test, we will reverse a trial court's ruling only if there has been a clear abuse of discretion." Syl. Pt. 6, *State v. Guthrie*, 205 W.Va. 326, 518 S.E.2d 83 (1999).

Syl. Pt. 2, *State v. Timothy C.*, 237 W. Va. 435, 787 S.E.2d 888 (2016).

In applying the test set forth in *Timothy C.* to the facts of this case, we are satisfied that the circuit court did not abuse its discretion by excluding the DNA evidence. First and foremost, the evidence was wholly irrelevant. During petitioner's trial, there was no question that petitioner had sex with the victim because *petitioner admitted to having sex with the victim*. There was also no question that the victim alleged she did not consent to the sexual contact to which she was subjected. Even if the victim had been assaulted by a second individual, that assault would not vitiate petitioner's culpability for his own admitted acts. The presence of another man's DNA on the victim's neck had no bearing whatsoever on whether petitioner subjected the victim to the assault alleged in the indictment. Second, in that the evidence was irrelevant, it had no probative value that might outweigh its prejudicial effect. Third, the State had a compelling interest in excluding the evidence: preventing embarrassment of the victim in that the evidence might have been perceived as showing that the victim engaged in other sexual behavior. Thus, the balance of interests weighs entirely in favor of the exclusion of the evidence, and the trial court did not err by denying petitioner's motion for judgment of acquittal or for a new trial on this ground.

For the foregoing reasons, we affirm.

Affirmed.

**ISSUED:** April 26, 2021

**CONCURRED IN BY:**

Chief Justice Evan H. Jenkins
Justice Elizabeth D. Walker
Justice Tim Armstead
Justice John A. Hutchison
Justice William R. Wooton

8