OPINION OF THE COURT
RENDELL, Circuit Judge.
Eugene Duncan was convicted by a jury of being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g). Duncan argues that we should vacate his conviction and remand for a new trial based on three alternate grounds. First, he complains of two evidentiary exclusions by the District Court. Second, he maintains that the District Court misapplied the “public safety” exception to Miranda when it refused to suppress statements that he allegedly made to the arresting officers. Third, Duncan asserts that the Government committed prosecutorial misconduct during its summation by commenting on his failure to introduce evidence that the District Court had excluded. We have considered all three grounds, and we will affirm.[1]
We recount the facts in some detail, as they are essential to our reasoning. On October 28, 2005, there was a shooting at the Kingsbury Apartment Complex in Trenton, New Jersey. It is undisputed that Duncan had nothing to do with it. Late the next night, Duncan was sitting in the driver’s seat of a red car parked near the Complex when Detectives Astbury and Woodhead pulled up in an unmarked police car. Astbury and Woodhead were members of the Trenton Police Department’s Tactical Anti-Crime Unit (“TAC”). Ast-bury and Woodhead both testified that they were in the neighborhood of the Kingsbury Apartment Complex investigating a drug tip that did not pan out. They explained that they then happened to see *603 Duncan sitting in the driver’s seat of a red car parked on a quiet street. They testified that they pulled up next to the car and then approached it on foot because Duncan was drinking a bottle of beer. According to the detectives, Astbury approached the driver’s side, Woodhead approached the passenger’s side, and Duncan was the only person in the car.
Astbury testified that when he shined a flashlight into the car, he saw Duncan attempting to hide the beer bottle on the floor with his left hand and “shoving” a “shiny silver object” into his right jacket pocket with his right hand. Based on his experience, Astbury thought that the shiny silver object was a handgun. Astbury then asked Duncan for the beer and identification, intending to write him up for public drinking.
According to Astbury, the following sequence of events transpired next: Duncan got out of the car without having been asked to do so, appeared nervous, “made a quick movement towards his right pocket with his right hand, [and] began to bend down towards the roadway.” (App.126.) Astbury then grabbed Duncan’s arms and held them on the roof of the car, but Duncan once more reached toward his right jacket pocket. Astbury again grabbed Duncan’s arms, put them back on the roof of the car, and “conducted a quick pat-frisk” of the jacket pocket area. (App. 127.) He “felt a hard object that was similar in size and shape to a weapon [and] believed it to be a handgun.” (App.128.) Astbury then pulled Duncan’s arms behind his back and, without advising him of his Miranda rights, asked him whether the object was a gun. Duncan answered, “[Y]es, but it’s not mine.” (App.129.) At trial, Astbury gave the following explanation as to why he asked Duncan this question:
Sometimes it’s better on the street to know if you have a gun, if somebody who has a gun knows that the police know you have a gun or anything that they don’t want the police to find, it makes the situation a little bit easier. If they think that they’re still hiding it, they’re still more nervous, as well as if I know it’s a gun, I can go inside of his pocket more carefully and get it out rather than just going in there and not knowing what it is.
(App.129-30.)
Both detectives testified that, at this point, Astbury called out to Woodhead the Trenton police codeword for gun — “301”— put Duncan in handcuffs, and removed a silver handgun from Duncan’s right jacket pocket. In addition, Astbury related that he called for backup after Duncan confirmed that the object in his pocket was a gun. According to Astbury, it took “less than two minutes” from the time that he and Woodhead first saw Duncan until the time they placed him under arrest. (App. 136.)
Woodhead told the Court that he then took Duncan to the rear of the police car and “conducted a secondary search” of Duncan’s person. (App.296.) According to Woodhead, neither of the detectives said anything during this search, but Duncan said again that the gun was not his and elaborated that he had a “story” and that he had “borrowed the jacket from someone on Monmouth Street.” (App.296-97.) According to Astbury, Duncan made these statements to Woodhead “[l]ess than three minutes” after he told Astbury that the object in his pocket was a gun. (App.36.)
Duncan’s mother, who lived at the Kingsbury Apartment Complex, testified that police in the neighborhood were “looking for a red [ ] car with a black man in it” in connection with the shooting from the previous night. (App.357, 362-63.) Duncan’s defense theory was that (1) an alert went out over Trenton police radio about *604 the Kingsbury shooting, informing officers that an African-American man in a red car was a suspect; (2) as members of the TAC unit, Astbury and Woodhead heard the alert; and (3) the detectives fabricated the entire gun story as a pretext for bringing Duncan in for questioning about the shooting because he matched the suspect profile and because they saw a red scarf — typical attire for local gang members — in the back seat of the red car.
Duncan did not take the stand, but a friend, Joseph Myles, testified that he was in the front passenger’s seat next to Duncan when the officers pulled up next to the red car and that it was he (not Duncan) who was drinking at the time. Myles explained that the officers did not immediately address him, even though he was the one with the beer; rather, one of the officers approached the car and asked Duncan about the red scarf that was in the back seat. According to Myles, Duncan responded that the scarf and the car were not his, after which the police ordered Duncan out of the car and frisked him. Myles stated that three officers then came to the passenger’s side of the ear, ordered him to step out, frisked him, and then told him that “you better go before you get locked up.” (App.403.) Myles’s testimony indicated that there were at least five officers at the scene.
Myles told the Court that at no time that night did he see Duncan with a gun, let alone see him trying to hide one in his jacket pocket. In addition, Myles testified that, as far as he remembered, Duncan was not even wearing a jacket.
The first evidentiary ruling that Duncan challenges on appeal is the District Court’s refusal to allow defense counsel to ask Detective Astbury whether anyone from the TAC unit had interviewed Duncan about the Kingsbury shooting at the station house after his arrest. The second evidentiary ruling that Duncan now challenges is the District Court’s refusal to enforce a subpoena against a Trenton police officer who would have testified about sending the alleged alert about the Kings-bury shooting over Trenton police radio. Duncan urges that allowing these pieces of evidence would have made more probable his defense theory that the weapons charge against Mr. Duncan was a pretext for questioning him about the Kingsbury shooting.
Taking the second exclusion first, we credit the District Court’s view that the testimony would not have been relevant. The officer presumably would have testified that an alert went out, but this was not the issue. The issue was whether Astbury and Woodhead were aware of the shooting and, thus, may have been acting with the motive that Duncan suggested.
Similarly, as to the first exclusion, the relevance of the information sought to be elicited is dubious at best. The mere fact that Duncan was questioned at the station house about the Kingsbury shooting, without more, does not “hav[e] any tendency” to make it “more probable ... than it would be without th[at] evidence” that the arresting officers at the scene knew about the shooting and were motivated by that knowledge to fabricate the story about the gun. See Fed.R.Evid. 401. Based on the record as it was developed before the District Court, Astbury and Woodhead’s motivation and the actions of officers at the station house are two different things. Without some nexus between them, the argument that subsequent station house questioning bears on the detectives’ motivation for arresting Duncan is no more than speculation.
Accordingly, we conclude that the District Court did not abuse its discretion in making either of these exclusionary rulings.
Before trial, Duncan moved to suppress the statements that he allegedly made to *605 Detectives Astbury and Woodhead after Astbury had asked — without Duncan having been advised of his Miranda rights— whether the object in his jacket pocket was a gun. The Government conceded that this was a custodial situation, which ordinarily triggers Miranda’s requirements, but argued that Astbury’s question fell under the “public safety” exception to Miranda. The District Court agreed and therefore refused to suppress Duncan’s statements to Astbury.
While statements made by a defendant stemming from custodial interrogation are generally inadmissible at trial and presumed to have been compelled if the defendant was not previously advised of his Miranda rights, the Supreme Court, in New York v. Quarles, 467 U.S. 649, 655, 104 S.Ct. 2626, 81 L.Ed.2d 550 (1984), established a “ ‘public safety’ exception” to Miranda. Under this narrow exception, the police do not need to give the Miranda warnings before asking a suspect questions that are necessary to protect the public or the police from immediate danger, Quarles, 467 U.S. at 656-59 & n. 8, 104 S.Ct. 2626. The exception applies when it would have been objectively reasonable for the officer to believe that asking the question was necessary to protect the public or police from immediate danger. Id. at 656, 659 n. 8,104 S.Ct. 2626.[2]
The Government urges that the District Court correctly applied the public safety exception because, “with Duncan repeatedly reaching for his pocket despite Detective Astbury’s commands to stay still and efforts to restrain his arms, it was important for the detectives, to ensure their personal safety and the safety of nearby residents, to immediately ascertain whether Duncan in fact had a gun on him.” (Appellee’s Br. 17.) In addition to Duncan’s furtive, uncooperative behavior, the Government points to the rapidity with which the encounter transpired as support for the application of the exception. Further, it contends that Astbury’s conduct immediately after Duncan answered his question — his use of a codeword to inform Woodhead about the gun and his decision to call for backup — demonstrate that Ast-bury had “an objectively reasonable safety concern in a volatile situation.” (Appel-lee’s Br. 17.) Duncan counters that the exception is a narrow one and that there was no necessity for the officer to inquire whether he had a gun.
The public safety exception requires examination of the “totality of the circumstances.” See United States v. Reyes, 353 F.3d 148, 152 (2d Cir.2003) (citing United States v. Banks, 540 U.S. 31, 42, 124 S.Ct. 521, 157 L.Ed.2d 343 (2003)); United States v. DeSantis, 870 F.2d 536, 541 (9th Cir.1989). The dispositive question here is whether, considering all the circumstances, it was objectively reasonable for Detective Astbury to have thought that asking Duncan whether the object indeed was a gun was necessary to protect himself, his partner, or the public from immediate danger.[3] *606 While this is a close case given the narrowness of the exception, we conclude that we should answer in the affirmative in the fact pattern before us. Given Duncan’s movement of his arms and reaching toward his pocket, and the perceived and obvious danger if the object was in fact a gun and were to go off, we find that the one question that was asked, clearly for reasons of safety, was permissible under the totality of the circumstances. Accordingly, the District Court properly refused to suppress Duncan’s statement in response to the question.[4]
Duncan also urges on appeal that the prosecutor improperly argued in summation that there was no evidence to support the theory that Astbury or Woodhead had fabricated the story about the gun and had lied on the stand. The prosecutor urged that Duncan had failed to adduce any evidence that he had been questioned about the shooting, although she knew full well that the District Court had prevented him from pursuing this line of inquiry. We agree that this was unfair. The prosecutor’s comments regarding the lack of evidence supporting the alleged motive for Astbury and Woodhead to frame Duncan were improper. The main reason the jury was not presented with this evidence was that the Court had granted the Government’s earlier requests to exclude it. While the District Court probably should have taken action in response to Duncan’s objection, we conclude that this was harmless error because the entire issue of whether Duncan had been questioned at the station house was, at best, of attenuated relevance to the officers’ credibility, as
we have discussed above, and, thus, to Duncan’s defense.
Accordingly, we will AFFIRM the District Court’s Judgment and Commitment Order.

. The District Court had jurisdiction pursuant to 18 U.S.C. § 3231, and we have jurisdiction pursuant to 28 U.S.C. § 1291.

. We review for clear error factual findings underlying the denial of a motion to suppress a defendant’s non-Mirandized statement and review de novo the application of the law to those findings. United States v. Perez, 280 F.3d 318, 336 (3d Cir.2002).

. Judge Chagares writes separately, urging that three factors are useful in determining whether the public safety exception applies. He acknowledges, however, that these factors are not "the test.” We do not join in his concurring opinion because we believe that his proposed distillation of the Quarles test is unnecessary, and we are concerned that it could be mistaken for a "test.” This would be unfortunate because it misses the mark: the necessity, urgency, and immediacy mandated by Quarles get lost in the focus on three static aspects. It could also lead to an unwarranted expansion of this narrow exception to Miranda. The test under Quarles — whether police questioning is necessary to protect the public or police from an immediate danger— *606 is straightforward, and entails a "snapshot” look at the situation facing an officer at a moment in time, under the totality of the circumstances. It needs no distillation. Moreover, the "snapshot” here satisfies the Quarles test, with the required necessity, urgency, and immediacy.

. The Court also held that Duncan’s statements to Woodhead were admissible on a separate ground, finding that they were volunteered and thus beyond the ambit of Miranda altogether. Because we conclude that the public safety exception applied, we need not reach this alternate ground.