IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

January 2025 Term

_____

No. 23-7
_____

FILED

**May 22, 2025**
**released at 3:00 p.m.**
C. CASEY FORBES, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

STATE OF WEST VIRGINIA,
Plaintiff Below, Respondent,

v.

MONICA HARTWELL
Defendant Below, Petitioner.

_____

Appeal from the Circuit Court of Mercer County
The Honorable Derek Swope, Judge
Case No. 21-F-242

AFFIRMED
_____

Submitted: April 8, 2025
Filed: May 22, 2025

David B. Kelley, Esq.                          John B. McCuskey, Esq.,
The Kelley Law Firm                            Attorney General
Bluefield, Virginia                            Mark L. Garren, Esq.,
Counsel for Petitioner                         Assistant Attorney General
                                               Charleston, West Virginia
                                           `   Counsel for Respondent

CHIEF JUSTICE WOOTON delivered the Opinion of the Court.

**SYLLABUS BY THE COURT**

1.     "'A trial court's evidentiary rulings, as well as its application of the Rules of Evidence, are subject to review under an abuse of discretion standard.' Syl. Pt. 4, *State v. Rodoussakis*, 204 W. Va. 58, 511 S.E.2d 469 (1998)." Syl. Pt. 1, *State v. Timothy C.*, 237 W. Va. 435, 787 S.E.2d 888 (2016).

2.     """The factors to be considered by the trial court in making a determination of whether a custodial interrogation environment exists, while not all-inclusive, include: the location and length of questioning; the nature of the questioning as it relates to the suspected offense; the number of police officers present; the use or absence of force or physical restraint by the police officers; the suspect's verbal and nonverbal responses to the police officers; and the length of time between the questioning and formal arrest." Syllabus Point 2, *State v. Middleton*, 220 W. Va. 89, 640 S.E.2d 152 (2006) *[, overruled on other grounds by State v. Eilola*, 226 W. Va. 698, 704 S.E.2d 698 (2010)*].*' Syllabus point 4, *Damron v. Haines*, 223 W. Va. 135, 672 S.E.2d 271 (2008)." Syl. Pt. 2, *State v. Campbell*, 246 W. Va. 230, 868 S.E.2d 444, 446 (2022).

3.     The need for answers to questions in a situation posing a threat to the public safety outweighs the need for the prophylactic rule of *Miranda v. Arizona*, 384 U.S. 436 (1966), protecting the Fifth Amendment's privilege against self-incrimination. This exception to the *Miranda* rule applies not only to protect the public safety but also to protect

i

police safety as well. The exception is not to be analyzed in light of the subjective motive of the questioner but rather from an objective perspective. Thus, when the State invokes the public safety exception first enunciated in *New York v. Quarles*, 467 U.S. 649 (1984), in response to a criminal defendant's motion to suppress statements made in answering a police officer's questions which were asked before *Miranda* warnings were given, the circuit court must determine, based all of the evidence presented, whether the information sought by the police was immediately necessary to secure the public safety and/or officer safety in light of the exigencies of the situation.

WOOTON, Chief Justice:

Petitioner Monica Hartwell ("the petitioner") appeals the December 7, 2022, order entered by the Circuit Court of Mercer County, West Virginia, sentencing her to a determinate term of imprisonment of forty years after a jury convicted her on one count of second-degree murder,[1] a charge arising from the shooting death of Michael Walker ("the victim") on the front porch of the petitioner's home. The sole issue before us involves the admissibility of a statement made by the petitioner immediately after she was taken into custody and handcuffed outside the home: as West Virginia State Trooper Shaun Keith Weikle ("Trooper Weikle") and the petitioner were walking to the trooper's vehicle, he asked, "where's the gun?", to which she responded, "it's on the couch."[2]

On appeal, the petitioner contends that the circuit court erred in admitting her statement to Trooper Weikel – a statement made while she was in custody and before she had been read her rights pursuant to *Miranda v. Arizona*, 384 U.S. 436 (1966). In response, the State argues that Trooper Weikle's three-word question did not constitute an "interrogation" as that term is understood, and alternatively that the question fell within the

---

[1] *See* W. Va. Code § 61-2-1 (2020).

[2] The admissibility of the gun into evidence was not raised as an issue during the proceedings below and has not been raised as an issue on appeal.

1

public safety exception to *Miranda* as articulated by the United States Supreme Court in *New York v. Quarles*, 467 U.S. 649 (1984).

After careful consideration of the parties' briefs and oral arguments, the appendix record, and the applicable law, we find no error in the circuit court's decision finding the statement to be admissible in evidence, and we therefore affirm.

## I.    FACTS AND PROCEDURE BELOW

The facts of this case are quite simple. The petitioner lived in a home in Mercer County, West Virginia, with her long-time boyfriend, the victim, and her ex-husband, Brian Smith. The victim had unspecified "mental health issues" which, according to his next-door neighbor Craig Young, required him to be hospitalized several times a year for medication readjustment and "getting his head straight."

On July 26, 2020, the victim was loudly spouting "gibberish," including claims that he was variously God or Jesus Christ, while he and the petitioner were on the front porch of the home. Mr. Smith was in the yard in back of the house, either doing some yardwork or sunbathing, in an effort to put distance between himself and the victim's ranting monologue. Mr. Young and his fiancé, Teressa Horne, were doing a woodworking project on their driveway, which was approximately ten feet from petitioner's home, and

2

could not help but hear. At some point the petitioner came over to where the two were working and apologized, telling them that she was "going to get this neighborhood back to normal soon." Upon leaving Mr. Young's driveway, the petitioner went back home; Mr. Smith began coming toward the front of the house to ask the victim to either quit yelling or go inside; and Mr. Young and Ms. Horne went into their house to determine whether the piece of wood trim they'd been cutting was the right length. A very short time later – variously estimated to be between five and thirty seconds – Mr. Young and Ms. Horne heard a gunshot and ran out of their house. Simultaneously, Mr. Smith rounded the corner and glimpsed the front door shutting, saw the victim lying on the porch, and shouted to Mr. Young and Ms. Horne that "she's shot Michael! Call 9-1-1!" Ms. Horne immediately did so.

Mr. Young, Ms. Horne, and Mr. Smith all remained near the porch, where the victim's body lay; the petitioner, however, had gone into the house and remained inside, alone, until the West Virginia State Police and the Mercer County Sheriff's Department arrived fifteen or twenty minutes later. After Mr. Young informed the officers that the petitioner had shot the victim and was inside the house, the officers "attempt[ed] to make contact with [her] . . . [and] we was able to get [her] out of the residence with no incident." Trooper Weikle immediately handcuffed the petitioner and, as he began to escort her to his cruiser, asked, "where's the gun," to which the petitioner responded, "it's on the couch." Trooper Weikle testified that "at the time, we had not secured the weapon, at which time,

other officers had went into the residence to see if there was any other suspects or victims and locate the weapon for officer safety."

On July 26, 2020, the petitioner was indicted on a charge of first-degree murder. Prior to trial, the petitioner filed a motion in limine to prohibit the State from adducing any evidence of her statement to Trooper Weikle. The parties argued the motion[3] during an August 9, 2022, pre-trial conference, and the motion was denied by the circuit court in an order entered on September 9, 2022. We note that although the court's order does not contain any reasoning, it is clear from the transcript of the pre-trial conference that the court found the petitioner's statement in response to Trooper Weikle's question to be admissible as routine, on-the-scene questioning for the purpose of ensuring officer safety. *See* discussion *infra*.

Thereafter, on August 22, 2022, following a two-day trial, the petitioner was convicted of second-degree murder. Although she does not allege that the evidence at trial was insufficient to sustain her conviction, she points out that it was wholly circumstantial: no one saw her shoot the victim, and there was no forensic evidence linking her to the crime. Additionally, although the State argued that petitioner's statement to Mr. Young and Ms. Horne to the effect that she was "going to get this neighborhood back to normal soon"

---

[3] Neither party produced any testimony or evidence in support of their respective positions.

was evidence of premeditation and intent, Mr. Young testified that he believed it to be an assurance that the victim would soon be back in the hospital for treatment of his mental illness. Thus, it is readily apparent that the petitioner's statement to Trooper Weikle evidencing her knowledge as to the location of the weapon, and the fact that it was located inside the petitioner's home during a time when she was the only person present, was critical evidence.

By order entered on December 7, 2022, the petitioner was sentenced to a forty-year term of imprisonment. This appeal followed.

## II. STANDARD OF REVIEW

With respect to the petitioner's argument that her statement was inadmissible because it was the result of custodial interrogation at a time when she had not yet been given *Miranda* warnings, this Court has deemed it

> "a well-established rule of appellate review in this state that a trial court has wide discretion in regard to the admissibility of confessions and ordinarily this discretion will not be disturbed on review." Syl. pt. 2, *State v. Vance*, 162 W. Va. 467, 250 S.E.2d 146 (1978). Moreover, 'A trial court's decision regarding the voluntariness of a confession will not be disturbed unless it is plainly wrong or clearly against the weight of the evidence.' Syl. pt. 3, *Id.* However,
>
>> 'This Court is constitutionally obligated to give plenary, independent, and *de novo* review to the ultimate question of whether a particular

5

confession is voluntary and whether the lower court applied the correct legal standard in making its determination. The holdings of prior West Virginia cases suggesting deference in this area continue, but that deference is limited to factual findings as opposed to legal conclusions.'"

*State v. Campbell*, 246 W. Va. 230, 237, 868 S.E.2d 444, 451 (2022) (citation omitted). Petitioner's alternative argument, that the statement was inadmissible hearsay, is reviewed for abuse of discretion. *See, e.g.*, Syl. Pt. 1, *State v. Timothy C.*, 237 W. Va. 435, 787 S.E.2d 888 (2016) ("'A trial court's evidentiary rulings, as well as its application of the Rules of Evidence, are subject to review under an abuse of discretion standard.' Syl. Pt. 4, *State v. Rodoussakis*, 204 W. Va. 58, 511 S.E.2d 469 (1998).").

### III.   DISCUSSION

The threshold question for determination here is whether the petitioner's *Miranda* rights had attached at the time Trooper Weikle asked her, "where's the gun." In this regard, it is well-settled that an individual's *Miranda* rights attach only when the person is subject to custodial interrogation: "Two elements must be present before *Miranda* warnings are required: first, the person must be in custody, and, second, he or she must be interrogated." *State v. Farley*, 238 W. Va. 596, 606-07, 797 S.E.2d 573, 583-84 (2017) (citing *State v. Honaker*, 193 W.Va. 51, 60, 454 S.E.2d 96, 105 (1994)). The State concedes that the petitioner was in custody – she was in handcuffs and was being escorted to the

6

police vehicle – but argues that a single investigatory question posed to a suspect at the scene of a crime does not constitute a "*Miranda*-conceptualized custodial interrogation[.]"

> The starting point for defining "interrogation" in this context is, of course, the [United States Supreme] Court's *Miranda* opinion. There the Court observed that "[b]y custodial interrogation, we mean *questioning* initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way."

*Rhode Island v. Innis*, 446 U.S. 291, 298 (1980) (citing *Miranda*, 384 U.S. at 444). In that regard, the *Innis* court held that interrogation "must reflect a measure of compulsion above and beyond that inherent in custody itself." *Id*. at 300. Factors in determining whether there was a measure of compulsion in the questioning of a suspect include "the nature of the interrogator, the nature and condition of the suspect, the time and length of the questioning, the nature of the questioning-accusatory or investigatory, [and] the focus of the investigation at the time of questioning[.]" *Damron v. Haines*, 223 W. Va. 135, 141, 672 S.E.2d 271, 277 (2008). Further,

> "The factors to be considered by the trial court in making a determination of whether a custodial interrogation environment exists, while not all-inclusive, include: the location and length of questioning; the nature of the questioning as it relates to the suspected offense; the number of police officers present; the use or absence of force or physical restraint by the police officers; the suspect's verbal and nonverbal responses to the police officers; and the length of time between the questioning and formal arrest." Syllabus Point 2, *State v. Middleton*, 220 W. Va. 89, 640 S.E.2d 152 (2006) [*, overruled on other grounds by State v. Eilola*, 226 W. Va. 698, 704 S.E.2d 698 (2010)].' Syllabus point 4, *Damron v. Haines*, 223 W. Va. 135, 672 S.E.2d 271 (2008)."

7

*Campbell*, 246 W. Va. at 232, 868 S.E.2d at 446, Syl. Pt. 2.

Our review of the facts leads us to conclude that there is no clear answer under our precedents to the question of whether, under the facts and circumstances presented here, the petitioner was subjected to interrogation in violation of her *Miranda* rights. On the one hand, we are dealing with a single question asked by a single officer,[4] as the State emphasizes, and the question could fairly be deemed "investigatory" rather than "accusatory." *See Damron*, 223 W. Va. at 141, 672 S.E.2d at 277. However, we are reluctant to suggest that any questioning of a suspect at the scene of a crime as to factual matters that are clearly incriminating is authorized under the "investigative" rubric of *Damron*. *See id*. Further, and critically, the petitioner was handcuffed at the time the question was asked, and there were three State troopers and multiple Mercer County Sherrif's Department law enforcement officers on the scene during the relevant time frame.

In light of the above, we must consider the State's alternative argument, which is based on the rationale utilized by the circuit court in denying the petitioner's motion to

---

[4] Although numerous officers from both the State Police and the Mercer County Sheriff's Department responded to the scene, it cannot be ascertained from the record where any of those officers were positioned in relation to Trooper Weikle and the petitioner at the time Trooper Weikle asked, "where's the gun?".

8

suppress: that "[t]he *Miranda* safeguards were never intended to apply to the typical, 'on-the-scene' investigation. . . . [*Miranda* was] not intended to hamper the traditional function of police officers in investigating crime[.]" *See State v. Preece*, 181 W. Va. 633, 638, 383 S.E.2d 815, 820 (1989) (quoting, in part, *Miranda*, 384 U.S. at 477), *overruled on other grounds by State v. Guthrie*, 205 W. Va. 326, 518 S.E.2d 83 (1999). In our view, although the rationale of *Preece* is persuasive, the case is not dispositive as to the facts before us; the *Preece* holding was specifically limited to "whether a *traffic investigation* has escalated into an accusatory, custodial environment." *Id*. at 641, 383 S.E.2d at 823 (emphasis added). As the *Preece* Court specifically noted, in traffic investigations, "although a person is frightened or nervous when detained . . . it is not equivalent to the fear described in *Miranda,* which compels one to incriminate himself, because there is no assurance that the detained motorist will be cited, let alone criminally charged[.]" *Id*. at 639-40, 383 S.E.2d at 821-22 (footnote omitted). Further, there is a critical factual distinction between *Preece* and the instant case because in *Preece*, "[t]he appellant was restrained, while in the stretcher; however, *the restraint was not imposed by the officers*[,]"*id*. at 642, 383 S.E.2d at 824 (emphasis added), which militated against a finding of "an accusatory, custodial environment." *Id*. at 641, 383 S.E.2d at 823. Here, in stark contrast, the question can fairly be considered to be accusatory, as there is a compelling inference that only the petitioner, or perhaps an accomplice, would know the location of a murder weapon, and the petitioner was clearly in custody, as the State concedes.

Because we conclude that the facts of this case fall squarely within the public safety exception to the prophylactic rule established in *Miranda*, *see infra,* we need not determine the precise contours of a "*Miranda*-conceptualized custodial interrogation." In the seminal case of *New York v. Quarles*, 467 U.S. 649 (1984), the United States Supreme Court established the rule and cogently explained its rationale:

> We conclude that the need for answers to questions in a situation posing a threat to the public safety outweighs the need for the prophylactic rule protecting the Fifth Amendment's privilege against self-incrimination. We decline to place officers such as Officer Kraft in the untenable position of having to consider, often in a matter of seconds, whether it best serves society for them to ask the necessary questions without the Miranda warnings and render whatever probative evidence they uncover inadmissible, or for them to give the warnings in order to preserve the admissibility of evidence they might uncover but possibly damage or destroy their ability to obtain that evidence and neutralize the volatile situation confronting them.
>
> * * *
>
> As we have in other contexts, we recognize here the importance of a workable rule "to guide police officers, who have only limited time and expertise to reflect on and balance the social and individual interests involved in the specific circumstances they confront." Dunaway v. New York, 442 U.S. 200, 213-214, 99 S.Ct. 2248, 2257, 60 L.Ed.2d 824 (1979). But as we have pointed out, we believe that the exception which we recognize today lessens the necessity of that on-the-scene balancing process. The exception will not be difficult for police officers to apply because in each case it will be circumscribed by the exigency which justifies it. We think police officers can and will distinguish almost instinctively between questions necessary to secure their own safety or the safety of the public and questions designed solely to elicit testimonial evidence from a suspect.

10

467 U.S. at 657-59 (footnote omitted). This Court has never expressly adopted the public safety exception to *Miranda*, although we have previously applied it, albeit in a memorandum decision. *See Yost v. Terry*, No. 17-0728, 2018 WL 4913832, at *6 (W. Va. Oct. 10, 2018) (memorandum decision) ("the officers' questions [about the location of the gun] fell within the public safety exception to *Miranda* articulated *in New York v.* Q*uarles*, 467 U.S. 649 (1984). In *Quarles*, the Supreme Court concluded that 'the need for answers to questions in a situation posing a threat to the public safety outweighs the need for the prophylactic rule protecting the Fifth Amendment's privilege against self-incrimination.' *Id.* at 657. '[T]he "prototypical example" for application of the public safety exception is the situation, as in *Quarles*, of a missing weapon.'") *Id*. (citation omitted).[5] Thus, we take

---

[5] Although *Quarles* dealt with questions asked of a suspect prior to the administration of *Miranda* warnings, which was also the case in *Yost*, 2018 WL 4913832, at *1, the United States Court of Appeals for the Fourth Circuit has held that the public safety exception applies with equal force even after a suspect has invoked his *Miranda* rights. *See U. S. v. Mobley*, 40 F.3d 688 (4th Cir. 1994):

> [T]he "public safety exception" to the *Miranda* framework should be recognized under the present circumstances. While the reasoning of *Quarles* is not on all points with the situation in which the accused has claimed his right to counsel, the danger to the public and police from hidden traps and discarded weapons is as evident after the *Miranda* warnings have been given as before, and
>
> > [t]he same considerations that allow the police to dispense with providing *Miranda* warnings in a public safety situation also would permit them to dispense with the prophylactic safeguard that forbids initiating further questioning of an accused who requests counsel.

this opportunity to expressly adopt the public safety exception and to establish guidelines for its application on a case-by-case basis, discussed *infra* in greater detail.

Although our research indicates that the public safety exception of *Quarles* has been widely, if not universally accepted in state and federal courts, application of the exception differs between courts utilizing what has been characterized as "the broad approach" and those utilizing "the narrow approach." *See generally* Rorie A. Norton, Note, *Matters of Public Safety and the Current Quarrel over the Scope of the Quarles Exception to Miranda*, 78 FORDHAM L. REV. 1931, 1949 - 58 (2010). Those courts utilizing the broad approach "eschew any consideration of an officer's actual knowledge or the immediacy of a threat[,]" focusing instead on the "inherent danger" of the situation, which in turn is characterized as "circumstances posing any reasonable threat to the public or officers, with limited consideration of the officer's actual knowledge of the threat prior to questioning, its imminence, or the source of the threat." *Id*. at 1949. *See, e.g*., *United States v. Edwards*, 885 F.2d 377, 384 (7th Cir. 1989) (public safety exception applied to officer's questions about whether suspect had a gun because "drug dealers are known to arm themselves, particularly when making a sale[.]");[6] *State v. Widmer*, 461 P.3d 881, 890-91 (N.M. 2020)

---

*Id*. at 692 (footnote omitted) (citing *U.S. v. DeSantis*, 870 F.2d 56, 541 (9th Cir. 1989)). Because this issue is not presented in the instant case, we do not address it.

[6] This reasoning was expressly rejected in *Mobley*, wherein the Fourth Circuit held that

(applying public safety exception where "question was not asked *solely* to elicit incriminating testimony. The *potential* for Defendant having objects on his person that threatened officer safety 'outweigh[ed] the need for the prophylactic rule protecting the Fifth Amendment's privilege against self-incrimination[,]'" and specifically rejecting any requirement that a question must be "focused . . . [and] necessary to ensure the safety of the officer when there is an objective, immediate threat to the safety of the officer."); *State v. Mata*, 624 S.W.3d 824, 828 (Tex. Crim. App. 2021) (holding that the public safety exception applied to questions seeking the location of a kidnapped child because the exception, "far from complicating the thought processes and the on-the-scene judgments of police officers, will simply free them to follow their legitimate instincts when confronting situations presenting a danger to the public safety.").

In contrast, the narrow approach focuses on the specific facts underlying an officer's belief that certain questions are necessary "to secure [officer] safety and/or the

> [a]bsent other information, a suspicion that weapons are present in a particular setting is not enough, as a general matter, to demonstrate an objectively reasonable concern for immediate danger to police or public; each case must be examined on its own facts to determine whether the deviation from the standard rule is justified by the totality of the circumstances in which the questioning takes place.

40 F.2d at 693 n.2.

safety of the public," *see Quarles*, 467 U.S. at 659, primarily, facts which bear upon the immediacy of law enforcement officers' need for information and the exigency of the circumstances. A leading case which is often cited as representative of the narrow approach is *Mobley*, where at least eight officers entered defendant Mobley's apartment, secured Mobley, who was naked and unarmed, against the wall, ascertained that no one else lived in the apartment, and did a security sweep of the apartment to ascertain that no one other than Mobley was present. 40 F.3d at 690. Only then did an officer ask Mobley whether there were any guns on the premises, to which he responded that there was one in a bedroom closet, on a shelf. *Id.* at 691.The district court denied Mobley's motion to suppress his statement, and the United States Court of Appeals for the Fourth Circuit reversed:

> Absent such circumstances posing an objective danger to the public or police, the need for the [*Quarles*] exception is not apparent, and the suspicion that the questioner is on a fishing expedition outweighs the belief that public safety motivated the questioning that all understand is otherwise improper.
>
> No such danger is apparent in the present case. As noted, Mobley was encountered naked; by the time he was arrested, the FBI already had made a security sweep of his premises, and they had found that he was the sole individual present, and that the apartment was a residence for Mobley alone. As he was being led away, an FBI agent asked him whether there were any weapons present. These facts contrast sharply with those of *Quarles,* and we are persuaded that they fall without, rather than within, the exception *Quarles* recognized. There is nothing that separates these facts from those of an ordinary and routine arrest scenario. There was no explanation at any time as to what extraordinary circumstances prompted this question, and we must conclude that there were none. Although we believe that the public safety exception is a valid and completely warranted exception to the *Miranda* and *Edwards* rules, we are persuaded that there was no demonstration of an "immediate need" that would validate protection under the

14

> *Quarles* exception in this instance. *Absent an objectively reasonable concern for immediate danger to police or public, we must follow the rule, not the exception.*

40 F.3d at 693 (emphasis added and footnote omitted); *see also State v. Lowe*, 812 N.W.2d 554, 579 (Iowa 2012) ("the public safety exception is closely drawn and narrow in scope. . . . For the exception to apply, there must be a threat to public safety and an 'immediate necessity' for the information the officer seeks to obtain by questioning a suspect in violation of *Miranda*. . . . The exception will only apply in situations where there is 'sufficient exigency to justify the questioning.'") (citations omitted); *United States v. Duncan*, 308 F. App'x 601, 605 n.3 (3d Cir. 2009) (describing the public safety exception as requiring "necessity, urgency, and immediacy").

We believe that the reasoning of *Mobley* is sound; a case-by-case analysis of immediacy and exigency, i.e., whether questions posed to a suspect in the absence of *Miranda* warnings were prompted by "an objectively reasonable concern for immediate danger to police or public," *Mobley*, 40 F.3d at 693, will ensure that the *Quarles* exception is not applied so broadly as to swallow the *Miranda* rule wholesale. Thus, we hold that the need for answers to questions in a situation posing a threat to the public safety outweighs the need for the prophylactic rule of *Miranda v. Arizona*, 384 U.S. 436 (1966), protecting the Fifth Amendment's privilege against self-incrimination. This exception to the *Miranda* rule applies not only to protect the public safety but also to protect police safety as well. The exception is not to be analyzed in light of the subjective motive of the questioner but

rather from an objective perspective. Thus, when the State invokes the public safety exception first enunciated in *New York v. Quarles*, 467 U.S. 649 (1984), in response to a criminal defendant's motion to suppress statements made in answering a police officer's questions which were asked before *Miranda* warnings were given, the circuit court must determine, based on all of the evidence presented, whether the information sought by the police was immediately necessary to secure the public safety and/or officer safety in light of the exigencies of the situation. With this analytical framework in mind, we turn to the petitioner's claim that the public safety exception does not apply under the facts and circumstances of this case.

As noted *supra*, the circuit court denied the petitioner's motion to suppress on the ground that "routine, on-the-scene questioning" for the purpose of ensuring officer safety is always permissible. We find this formulation too broad, because *Quarles* establishes a fact-based exception to *Miranda*, not a hard-and-fast rule. Nonetheless, "[t]his Court may, on appeal, affirm the judgment of the lower court when it appears that such judgment is correct on any legal ground disclosed by the record, regardless of the ground, reason or theory assigned by the lower court as the basis for its judgment." Syl. Pt. 2, in part, *Milmoe v. Paramount Senior Living at Ona, LLC*, 247 W. Va. 68, 875 S.E.2d 206 (2022).

16

It is critical to our resolution of this case that Trooper Weikle testified, without contradiction, that at the time he asked the petitioner, "[w]here's the gun?", officers had not yet secured the weapon. Prior to their entry into the petitioner's home, officers knew only that the victim had been shot on the front porch, that the petitioner had apparently[7] gone into the house immediately thereafter, and that she had not been seen again by Mr. Smith, Mr. Young, or Ms. Horne during the fifteen to twenty minutes it took for law enforcement to respond to the 9-1-1 call. Thus, after the petitioner had exited the house and been handcuffed, the officers still did not know whether there might be someone else inside who had access to the weapon. Further, they did not know whether the petitioner had left the weapon in the house or, during the interval of time that elapsed prior to the officers' arrival, thrown it from a window or back door into the unsecured environs of the property where it might be found by a passer-by or an inquisitive child.

It is readily apparent that the facts of this case stand in sharp contrast to the facts in *Mobley*, where the police had already done a sweep of the defendant's apartment and were therefore assured that if even there was a weapon therein, it posed no threat to them or to the public. Here, in contrast, we conclude that Trooper Weikel was entitled to inquire about the location of the gun, given "the immediacy of the exigencies at hand," *Mackrill v. State*, 100 P.3d 361, 368 (Wyo. 2004), specifically, the very real possibility that

---

[7] No one actually saw the petitioner go into the house; rather, Mr. Smith testified that he heard a gunshot, rounded the corner, and saw the front door closing.

17

the gun was, or could soon be, in someone else's hands.  Accordingly, applying the public safety exception framework of *Quarles* as adopted by the Court herein, we affirm the circuit court's denial of the petitioner's motion to suppress her statement given in response to Trooper Weikel's question.[8]

## IV.    CONCLUSION

For the reasons set forth herein, the judgment of the Circuit Court of Mercer County is AFFIRMED.

Affirmed.

---

[8] The petitioner's secondary argument, that Trooper Weikel's testimony as to the petitioner's response to the question ("it's on the couch") was inadmissible hearsay, requires little discussion.  It is well established – indeed, it is beyond dispute – that a defendant's own statements are admissible against him or her as admissions of a party opponent under Rule 801(d)(2)(A) of the West Virginia Rules of Evidence. *See, e.g.*, *State v. Lambert*, 236 W. Va. 80, 94, 777 S.E.2d 649, 663 (2015) (statements made by defendant to a psychiatrist were admissible under the Rule); *accord*, *State v. Payne*, 225 W. Va. 602, 610-11, 694 S.E.2d 935, 943-44 (2010) (defendant's statements to police officer as he was being escorted out of home were admissible under the Rule); *State v. Dillon*, 191 W. Va. 648, 658, 447 S.E.2d 583 (1994) (defendant's tape recorded statements were admissible under the Rule). The petitioner cites no rules or cases to the contrary, and thus we easily reject her hearsay argument.